[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16876

_____

D.C. Docket Nos. 2:12-cv-00316-WKW-CSC,
2:13-cv-00781-WKW-CSC

CAREY DALE GRAYSON, et al 2:12-cv-00316

Plaintiffs,

versus

WARDEN,
COMMISSIONER, ALABAMA DOC, Defendants.

_____

DEMETRIUS FRAZIER, 2:13-cv-00781

Consol Plaintiff - Appellant,

versus

WARDEN,
COMMISSIONER, ALABAMA DOC,

Defendants - Appellees.

_____

DAVID LEE ROBERTS, 2:14-cv-01028

                                                  Consol Plaintiff - Appellant,

versus

WARDEN,
COMMISSIONER, ALABAMA DOC,

                                                  Defendants - Appellees.

_____

ROBIN D. MYERS, 2:14-cv-01029

                                                  Consol Plaintiff - Appellant,

versus

WARDEN,
COMMISSIONER, ALABAMA DOC,

                                                  Defendants - Appellees.

_____

GREGORY HUNT, 2:14-cv-01030

                                                  Consol Plaintiff - Appellant,

versus

WARDEN,
COMMISSIONER, ALABAMA DOC,

                                                  Defendants - Appellees.
                        _____

                    Appeal from the United States District Court

for the Middle District of Alabama
_____

(September 1, 2017)

Before TJOFLAT, ROSENBAUM and JILL PRYOR, Circuit Judges.

TJOFLAT, Circuit Judge.

I.

On July 1, 2002, the State of Alabama chose lethal injection, rather than electrocution, as its preferred method of implementing capital punishment.[1]  The Alabama Department of Corrections ("ADOC") thereafter adopted a three-drug protocol to administer the injection.[2]  The United States Supreme Court described an identical protocol, as implemented by the State of Kentucky, in *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520 (2008):

---

[1] Act 2002-492, 2002 Ala. Laws 1243 (codified at Ala. Code § 15-18-82.1).  A person sentenced to death in Alabama can still elect to die by electrocution instead of lethal injection. *See* Ala. Code § 15-18-82.1(a) (explaining "[a] person convicted and sentenced to death for a capital crime at any time shall have one opportunity to elect that his or her death sentence be executed by electrocution").

[2] *See Williams v. Allen*, 496 F.3d 1210, 1214 (11th Cir. 2007) (noting that Alabama's execution protocol consisting of "[sodium] [t]hiopental, [pancuronium bromide], and [p]otassium [c]hloride" had remained unchanged "since its inception in 2002").  This was the same three-drug protocol a number of states were using to administer capital punishment.  *See id.* (pointing out that Alabama's lethal injection protocol was "utilized by virtually every other state that executes its death row inmates by lethal injection"); *Jones v. Allen*, 485 F.3d 635, 640 n.3 (11th Cir. 2007) (explaining that Alabama "uses the same three-drug cocktail as nearly every other state where substantially similar challenges have been made"); *State by State Lethal Injection*, Death Penalty Information Center, https://deathpenaltyinfo.org/state-lethal-injection. (last visited July 12, 2017) (collecting state-by-state execution protocols and explaining "[u]ntil 2009, most states used a three-drug combination for lethal injections: an anesthetic (usually sodium thiopental . . .), pancuronium bromide . . . , and potassium chloride").

The first drug, sodium thiopental . . . , is a fast-acting barbiturate sedative that induces a deep, comalike unconsciousness when given in the amounts used for lethal injection. The second drug, pancuronium bromide . . . , is a paralytic agent that inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration. Potassium chloride, the third drug, interferes with the electrical signals that stimulate the contractions of the heart, inducing cardiac arrest. The proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs.

*Id.* at 44, 128 S. Ct. at 1527 (internal citations omitted).

On April 26, 2011, Alabama substituted pentobarbital, "a short-acting barbiturate" sedative,[3] for sodium thiopental, as the first drug in its execution protocol. *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011). Then, on September 10, 2014, the State substituted midazolam, a benzodiazepine sedative,[4] for pentobarbital. *Brooks v. Warden*, 810 F.3d 812, 816–17 (11th Cir. 2016). It also substituted rocuronium bromide for pancuronium bromide as the second drug. *Id.* at 817. Potassium chloride remained the third drug. *Id.*

In the four cases at hand, the appellants, four death row prisoners awaiting execution, claim that if they are executed in accordance with the lethal injection protocol now in place, they will suffer "cruel and unusual punishment" in violation

---

[3] *Nembutal*, RxList, http://www.rxlist.com/nembutal-drug.htm (last visited July 12, 2017).

[4] Midazolam is "a sedative of the benzodiazepine class." *Midazolam*, *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* 1130 (Marie T. O'Toole et al. eds., 7th ed. 2003).

4

of the Eighth Amendment.[5]  They seek an order under 42 U.S.C. § 1983 enjoining

the ADOC[6] from executing them pursuant to that protocol.[7]  In *Glossip v. Gross*,

135 S. Ct. 2726, 2737 (2015), the Supreme Court made clear that the "controlling

opinion in *Baze*" set forth the two-pronged standard a plaintiff must satisfy "to

succeed on an Eighth Amendment method-of-execution claim."  The first prong

requires the prisoner to demonstrate that the challenged method of execution

presents "a 'substantial risk of serious harm.'"  *Id.* (quoting *Baze*, 553 U.S. at 50,

128 S. Ct. at 1531).  That is, the method must "present[] a risk that is '*sure or very*

*likely* to cause serious illness and needless suffering, and give rise to sufficiently

*imminent* dangers.'"  *Id.* (quoting *Baze*, 553 U.S. at 50, 128 S. Ct. at 1531).  The

second requires the prisoner to "identify an alternative that is 'feasible, readily

implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'"

---

[5] The Eighth Amendment applies to the states through the Fourteenth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 344–45, 101 S. Ct. 2392, 2398 (1981).

[6] In addition to the ADOC, appellants seek injunctive relief against Walter Myers, Warden, Holman Correctional Center; Jefferson S. Dunn, Commissioner, the Alabama Department of Corrections; Carter Davenport, Warden, Holman Correctional Facility; and Cynthia Stewart, Warden, Holman Correctional Facility.  We refer to the defendants collectively as the ADOC.

[7] Appellants' cases, as framed in the amended complaints appellants filed in July and August of 2015, were consolidated by the District Court on November 5, 2015 for discovery and trial.  The District Court refers to these cases collectively as the "Midazolam Litigation."  In addition to an injunction barring their executions pursuant to the current three-drug protocol, appellants seek other injunctive relief: an order requiring the ADOC to, among other things, "disclose to Frazier and his counsel the lethal injection protocol," "submit any proposed changes to the execution protocol to the Court immediately upon making them," and disclose "when [the drugs used in the protocol] were purchased, where they were purchased from, and their National Drug Code identifying number."

*Id.* (quoting *Baze*, 553 U.S. at 52, 128 S. Ct. at 1532).  Showing "a slightly or marginally safer alternative" is insufficient to mount a successful challenge to a State's method of execution.  *Id.*  (quoting *Baze*, 553 U.S. at 51, 128 S. Ct. at 1531).[8]

Appellants contend that the ADOC's current protocol presents a substantial risk of serious harm that comports with *Baze*'s definition.  They argue that the risk is substantial because midazolam, a sedative, is not an analgesic like sodium thiopental and pentobarbital and will consequently fail to create the sustained state of anesthesia necessary to enable them to withstand the intolerable pain that will be generated by subsequent injections of rocuronium bromide and potassium chloride.  As required by *Baze*'s second prong, Appellants have also proposed three alternative methods of execution involving single injections of either sodium thiopental, compounded pentobarbital, or a 500-milligram bolus[9] of midazolam.

Before us for review is the District Court's order of October 31, 2016, granting the ADOC's motion for summary judgment pursuant to Rule 56 of the

---

[8] Because the plurality in *Baze* first articulated the standard governing Eighth Amendment method-of-execution challenges later applied by the Supreme Court in *Glossip*, we refer to the law governing Plaintiffs' claim here as the *Baze* standard.

[9] The English Oxford Dictionary defines a bolus as "a single dose of a drug . . . introduced rapidly into a blood vessel."  *Bolus*, OXFORD ENGLISH DICTIONARY 374 (2d ed. 1989).

6

Federal Rules of Civil Procedure.[10]  In its order, the Court concluded that

Appellants had failed to present probative evidence creating "a genuine dispute of

material fact as to [the existence of a feasible and readily implementable]

alternative method of execution, an essential prong of the *Baze/Glossip* test for an

Eighth Amendment method-of-execution claim."  Since Appellants' proof failed to

satisfy the alternative-method-of-execution requirement imposed by *Baze*, the

Court dismissed Appellants' Eighth Amendment claims without addressing the

other half of the *Baze* standard: whether the substitution of midazolam for

pentobarbital as the first drug of the three-drug injection protocol created a

"substantial risk of serious harm."

Appellants ask that we vacate the judgment because the District Court,

rather than determining whether the ADOC had satisfied its Rule 56 burden of

showing that there was "no genuine dispute as to any material fact," improperly

assumed the role of the trier of fact and resolved the genuine factual disputes in the

---

[10] The motion was addressed to each of the four cases as well as Carey Dale Grayson's case.  The same day the Court granted the ADOC's motion for summary judgment, it entered a final judgment in all four cases for the ADOC under Rule 54(b).  The Court should have entered a final judgment pursuant to 28 U.S.C. § 1291 because its judgment disposed of all of Appellants' claims, i.e., the claim that the substitution of midazolam for pentobarbital in the three-drug execution protocol rendered the protocol in violation of the Eighth Amendment.  For convenience, we refer to "judgment" in the singular, though the judgment required orders in four different cases.

7

ADOC's favor.[11]  The ADOC, in response, argues that the District Court did not

err and, even if it had, the error is of no moment because the law-of-the-case

doctrine bars Appellants' Eighth Amendment claims.  If not, they argue the statute

of limitations does so: they assert that the switch from pentobarbital to midazolam

does not constitute a "substantial change" to the State's three-drug execution

protocol; thus, the two-year limitations period passed years ago.

After hearing from the parties in oral argument and considering their briefs,

we conclude that genuine issues of material fact preclude summary judgment.  We

also conclude that Appellants' Eighth Amendment claims are not barred by the

law-of-the-case doctrine.  As to the ADOC's limitations argument, they did not

raise it below and the District Court did not consider it; we thus cannot address it

in the absence of a factual determination as to whether the substitution of

midazolam for pentobarbital constitutes a substantial change to Alabama's

execution protocol.  We accordingly vacate the District Court's judgment and

remand these cases for further proceedings.

## II.

The operative complaints and answers in these cases are identical with

respect to the Appellants' Eighth Amendment claim now before us.  For

---

[11] Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

convenience, we refer only to Demetrius Frazier's second amended complaint ("Frazier's Complaint" or "the Complaint").[12]  Similarly, our references to the ADOC's motion to dismiss and answer correspond specifically to the documents the ADOC filed in response to Frazier's Complaint.

Frazier's Complaint, filed on August 25, 2016, alleges—with respect to *Baze*'s "substantial risk of serious harm" prong—that midazolam will fail to anesthetize Frazier and therefore subject him to the intolerable pain the administration of rocuronium bromide and potassium chloride will cause.[13]  The

---

[12] Frazier's second amended complaint replicated the Eighth Amendment claims asserted in the amended complaints filed by Carey Dale Grayson, Gregory Hunt, Robin Dion Myers and David Lee Roberts on July 28, August 4 and August 11, 2015.  All of Appellants' complaints and subsequent pleadings were drafted by the same Assistant Federal Defender of the Middle District of Alabama, John Anthony Palombi.    And he represents Appellants in this appeal.  Grayson's case is currently pending appeal of a judgment pursuant to Rule 54(b) that addressed a different issue than those presented in the cases before us.  *See Grayson v. Comm'r, Ala. Dep't of Corr.*, No. 17-11339 (11th Cir. Mar. 28, 2017).

[13] The facts supporting this allegation are recited in several paragraphs of the Complaint, including the following:

25. The first drug, midazolam, is a benzodiazepine, not a barbiturate. It is to be given in a 500mg bolus, and according to the State's Motion to Set Execution Date, "is meant to serve as an anesthetic."  Midazolam is not designed for use as the sole drug in an anesthetic process, but as an anesthetic adjunct.
. . . .

27. The final drug, potassium chloride, disrupts the normal electrical activity of the heart and induces cardiac arrest by stopping the heart from pumping blood. Potassium chloride traveling in the bloodstream from the site of injection towards the heart causes an extreme burning sensation as it moves through the body destroying the internal organs.

28. In the event of incomplete anesthetic depth, the injection of potassium chloride causes excruciating pain that is agonizing for a recipient. The inmate

9

Complaint alleges—with respect to *Baze*'s requirement that a prisoner plead and prove the existence of an "alternative" method-of-execution significantly reducing a risk of severe pain—that "a single bolus of [compounded] pentobarbital . . . . is read[ily] available, and would entirely reduce the risk of pain associated with administering the paralytic and potassium chloride, because those drugs would not be used"; that sodium thiopental is available and "would cause death without need

_____

must be in a deep level of anesthesia before given this substance to ensure that he does not experience that horrific pain.
. . . .

30. Midazolam will not anesthetize Frazier, and regardless of the dose, will not eliminate the risk that a condemned inmate will experience pain from the paralytic or potassium chloride.

31. Midazolam is a benzodiazepine, which is a family of drugs used to treat anxiety. It is often used as a sedative prior to inducing anesthesia with a second drug, but is not used clinically as a sole anesthetic. There is a high likelihood that midazolam will fail to reliably create the sustained anesthetic state necessary for an inmate not to feel the intolerable pain associated with the second and third drugs in Alabama's protocol.

32. Further, there is evidence that midazolam has a "ceiling effect." That is, there is a limit on the effect of an increased dose of drugs. . . . [T]here are a limited number of receptors in the human body for midazolam, and once they are full, giving more midazolam has no effect.

33. Because of the way midazolam works in the human body, it could sedate an individual to the point where he was incapable of communicating that he was in pain while doing nothing to suppress the experience of pain. Because midazolam is a sedative and not an analgesic, there is a high likelihood that an inmate who receives a high dose of midazolam would be unable to respond to the noxious stimuli that constitute [the ADOC's] consciousness check, but would still feel the excruciating effects of the second and third drugs.
. . . .
38. Thus, there is an objectively intolerable risk that Frazier will not be adequately anesthetized before the second and third drugs have been administered, causing him to experience intolerable pain and suffering.

10

of a paralytic or potassium chloride";[14] that "a 500mg dose of midazolam will likely cause death in under an hour";[15] and that the ADOC "can obtain midazolam."

In addition to this statement of Frazier's Eighth Amendment claim, the Complaint also includes facts its drafter apparently thought would be probative of his Eighth Amendment claim at trial, but that are unnecessary to establish an Eighth Amendment claim sufficient to withstand a motion to dismiss. These unnecessary assertions of fact include: that midazolam administered in a multi-drug protocol previously failed to anesthetize prisoners executed in Ohio,[16] Oklahoma,[17] and Arizona;[18] that "[n]umerous states have switched from a two or three-drug protocol to a one-drug protocol; that "[a] report issued by a bipartisan committee recommended that states discontinue using three-drug lethal injection

---

[14] Frazier alleges that "the Nebraska Department of Corrections claims that it can obtain sodium thiopental to use in its protocol, and do so legally."

[15] Frazier derived the 500-milligram doseage amount from the Oklahoma district court's factual findings in *Glossip*. *See Glossip*, 135 S. Ct. at 2741–42 n.4 (explaining that the district court in that case "found that a 500mg dose of midazolam will likely cause death in under an hour").

[16] The Complaint goes on to assert that Ohio prisoner Dennis McGuire suffered "true pain and suffering" during his execution with a protocol consisting of midazolam and hydromorphone.

[17] Specifically, the Complaint states that Oklahoma bungled Clayton Lockett's execution using a protocol consisting of midazolam and hydromorphone when the prisoner "moved, spoke, and attempted to sit up, all after a doctor on the execution team said he was unconscious."

[18] The Complaint substantiates this point by noting that another botched execution occurred in Arizona when Joseph Wood was injected with midazolam and hydromorphone and took "almost two hours" and over 15 injections before dying.

11

cocktails and instead use a single large dosage of a barbiturate";[19] that "[s]tates including Texas, Colorado, Ohio, Georgia, Missouri, Mississippi, Oklahoma, South Dakota, and Pennsylvania have used or intend to use compounded pentobarbital for executions"; that "[s]ince January 1, 2014, nearly 40 executions have been carried out using a single bolus of pentobarbital, making it the most common method of execution in the United States";[20] and that the "Defendant's own expert endorses" the use of a single 500-milligram bolus of midazolam as a method of execution.[21]

The drafter of the Complaint also apparently thought that portions of the record in *Arthur v. Thomas*, a Middle District of Alabama case that presented an Eighth Amendment claim practically identical to Frazier's,[22] would be supportive

---

[19] The Complaint points out that the report found that three-drug protocols create greater opportunities for serious, painful errors and that "a one-drug method would decrease the problems associated with drug administration and eliminate the risk from using paralyzing or painful chemical agents."

[24] The paragraph in the Complaint containing this assertion concludes with the following argumentative sentences:

> This method of execution is ready, available, and would entirely reduce the risk of pain associated with administering the paralytic and potassium chloride, because those drugs would not be used. There is no justification for Defendants to persist in using drugs that admittedly cause an unconstitutional level of pain when this alternative is available.

[21] The Complaint also alleges that the "Defendants claim that they can obtain midazolam."

[22] *See Arthur v. Thomas*, 674 F.3d 1257, 1261–62 (11th Cir. 2012) (holding that the Eighth Amendment claim alleged in the complaint was sufficient to withstand a Rule 12(b)(6) motion to dismiss). The complaint originally challenged the ADOC's substitution of pentobarbital for sodium thiopental (as the first drug in the three-drug protocol) on the ground it was likely that pentobarbital would not anesthetize the prisoner prior to the administration of the

12

of Frazier's claim at trial. So, the drafter attached to the Complaint, as Exhibits A

and B, the transcript of the evidentiary hearing the District Court held in *Arthur* on

October 18 and 19, 2012. [23] Also attached, as Exhibit C, was the State of

Alabama's September 11, 2014 motion requesting the Alabama Supreme Court to

set a date for Frazier's execution. These exhibits are mentioned in the Complaint

by letter, but the Complaint does not incorporate by reference any of their contents.

The exhibits were entirely extraneous to Frazier's Eighth Amendment Claim. [24]

---

second and third drugs and thus would subject him to substantial risk of serious harm in the form of intolerable pain in violation of the Eighth Amendment. *See* Complaint at 5, 25–26, *Arthur v. Thomas*, 2011 WL 5294656 (M.D. Ala. Nov. 3, 2011) (No. 2:11-cv-438). In January 2015, a second amended complaint lodged a substantively identical challenge against Alabama's substitution of midazolam for pentobarbital in its execution protocol. *See* Second Amended Complaint at 1–3, 24–28, *Arthur v. Dunn*, 195 F. Supp. 3d 1257 (M.D. Ala. July 19, 2016) (No. 2:11-cv-438). In response to the Supreme Court's ruling in *Glossip*, Arthur would eventually amend his complaint to offer two alternative methods of execution: single-drug protocols consisting of sodium thiopental or compounded pentobarbital. *See Arthur v. Comm'r*, *Ala. Dep't. of Corr.*, 856 F.3d 1268, 1277 (11th Cir. 2016), *rev'g Arthur v. Dunn*, 195 F. Supp. 3d 1257 (M.D. Ala. 2016).

[23] Exhibit A consists of 328 pages and contains the testimony of the following individuals: Anthony Patterson, Warden, Holman Correctional Facility; David Lubarsky, M.D., an anesthesiologist; Mark Heath, M.D., another anesthesiologist, Matt Schulz, Assistant Federal Defender, Middle District of Alabama; Thomas Lagos, who witnessed the execution of his half-brother, Christopher Thomas Johnson, at the Holman Correctional Facility; Douglas Ray Price, Jr., who witnessed the execution of his nephew Max Payne, at the Holman Correctional Facility; Stephen P. Ganter, Assistant Federal Defender Middle District of Alabama; and Christine Freemen, Executive Director of the Federal Defender Office, Middle District of Alabama.

Exhibit B consists of 179 pages and contains the testimony of: Mark Dershwitz, M.D., anesthesiologist, and Ph.D., pharmacology, and Srikumaran K. Melethil, Ph.D. (pharmacokinetics), J.D.

[24] During oral argument in this appeal, Appellants' counsel conceded that the Exhibits were extraneous to the Complaint's allegations and thus were useless for the purpose of determining whether the Complaint stated a claim for relief sufficient to withstand a Rule

Frazier did not cite them in opposing the ADOC's motion for summary judgment, and the District Court made no reference to them in granting the motion.[25]

The ADOC moved to dismiss Frazier's complaint on September 8, 2015. *See* Consent to Judgment or in the Alternative, Motion to Dismiss at 1, *Frazier v. Myers*, No. 2:13-cv-781 (M.D. Ala. Sept. 8, 2015). The ADOC argued that in light of the Supreme Court's decision in *Glossip* and this Court's decision in *Chavez v. Fla. SP Warden*,[26] the District Court was required to dismiss Frazier's Complaint for failure to state a claim for relief:

> As the Eleventh Circuit and now the Supreme Court have found that other litigants cannot show that a 500-milligram bolus of midazolam would allow an inmate to feel the effect of the other two drugs—a result that is equivalent to what was achieved when the first drug administered was pentobarbital—Frazier must allege some additional evidence to survive dismissal.

*Id.* at 10.[27] The ADOC observed that in *Glossip*, the "Supreme Court held that the fact-findings about the use of midazolam being constitutional were not clearly

---

12(b)(6) motion to dismiss. We note that the ADOC did not move the District Court to strike the exhibits from the Complaint, nor did the Court strike them on its own initiative.

[25] The District Judge who presided over Appellants' cases presided over the bench trial in *Arthur* and ruled in favor of the ADOC. *Arthur v. Dunn*, No. 2:11-cv-438, 2016 WL 1551475 (M.D. Ala. Apr. 15, 2016). We note that the plaintiff in *Arthur* was represented by pro bono counsel licensed to practice in New York. The Federal Defender of the Middle District of Alabama had no involvement in the case.

[26] *Chavez v. Fla. SP Warden*, 742 F.3d 1267 (11th Cir. 2015).

[27] The ADOC's counsel apparently believed that *Glossip* and *Chavez* barred Frazier's Eighth Amendment claim unless he "allege[d] some additional evidence," i.e., in addition to the evidence the plaintiffs in *Glossip* and *Chazvez* had alleged, in order to state an Eighth

14

erroneous," and, moreover, "noted that every lower court to have considered the question reached the same conclusion: midazolam is capable of rendering someone unconscious and, therefore, eliminates any substantial risk of severe pain that might be caused by administering the other drugs in a three-drug lethal-injection protocol."[28] *Id.* at 11.

The ADOC further argued that Frazier's claim had been "time-barred for nearly eleven years" and was thus "due to be dismissed." *Id.* at 5. Noting that Alabama's two-year limitations period applied to Frazier's claim, it observed that the limitations period begins to accrue either when state review becomes final or when a state makes a substantial change to its execution protocol, whichever is later. *Id.* at 6. And since Frazier's case became final in 2000 and the State adopted lethal injection as its execution method in 2002, it argued that Frazier's case was time-barred unless a substantial change in its execution protocol was made. It then

---

Amendment claim sufficient to withstand dismissal pursuant to Rule 12(b)(6). We are aware of no rule that requires a plaintiff to allege evidence in order to survive a motion to dismiss. Federal Rule of Civil Procedure 8(a) sets forth the requirements of a sufficient pleading:

> (a) Claim for Relief. A pleading that states a claim for relief must contain:
> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a). Rule 8 does not contain an evidence requirement.

[28] In citing *Glossip* and the decisions of "every lower court to have considered the question," the ADOC is apparently attempting to invoke the doctrines of issue preclusion or judicial notice, or both. *See infra* Part III.A.

15

asserted that no such change was made: with respect to the substitution of midazolam for pentobarbital, the ADOC contended that "Frazier failed to plead any factual allegations or include any affidavits with his complaint that could plausibly show that the use of midazolam is a significant change from pentobarbital." *Id.* at 6–7. Further, it argued that because "the Supreme Court has rejected virtually identical claims about midazolam's effectiveness," and because "the factual allegations rejected in *Glossip* contained much greater detail and specificity than the hypothesized, unsubstantiated allegations" in Frazier's complaint, Frazier could not claim that the substitution of midazolam constituted a substantial change "as a matter of law." *Id.* at 7. Thus, the ADOC argued that Frazier's claim became time-barred in 2004, two years after Alabama adopted lethal injection. *Id.* at 6.

Assuming that the Complaint may have stated a plausible Eighth Amendment claim, the ADOC posited an alternative disposition: it would consent to the Court's entry of a judgment that "suspends the current lethal-injection protocol" and substitutes midazolam as the method of execution. *Id.* at 4. [29] "After an initial 500-milligram bolus of midazolam, the execution team [would] administer an additional 500-milligram dose of midazolam, if needed, until

---

[29] The ADOC relied on Frazier's attorney's affirmation in good faith, made under Fed. R. Civ. P. 11, that Frazier "ha[d] affirmed . . . [that] he has a factual basis to believe [that using midazolam in a single-drug protocol] will execute [Frazier] in a constitutionally acceptable manner." *Id.* at 3.

16

Frazier's sentence [was] carried out." *Id.* at 3. [30] This alternative disposition had a proviso: that the "Court order Frazier's counsel to procure a sworn assurance from Plaintiff that he is aware of the alternatives suggested in the latest complaint filed on his behalf, that he understands the implications of the complaint, and that he consents to be executed by a one-drug protocol using midazolam." *Id.* at 3.

The District Court ordered Frazier to respond to the ADOC's pleading by September 25, 2015. Order at 1, *Frazier v. Myers*, No. 2:13-cv-781 (M.D. Ala. Sept. 11, 2015). Frazier did so on that day. *See* Opposition to Defendants' "Consent to Judgment" and Motion to Dismiss at 1, *Frazier v. Myers*, No. 2:13-cv-781 (M.D. Ala. Sept. 25, 2015). He requested that the Court "reject the ADOC's offer of a consent judgment, deny Defendants' motion to dismiss, and issue a scheduling order for motions, hearings and discovery, leading to a trial on the issue of whether Alabama's present execution protocol is unconstitutional." *Id.* at 2.

On October 8, 2015, the District Court denied the ADOC's motion to dismiss, ordered the ADOC to answer Frazier's Complaint by October 22, 2015, declared that Appellants' cases would be referred to as the "Midazolam Litigation," and scheduled a status conference in the Midazolam Litigation for November 4, 2015, to discuss whether the Court should consolidate the cases for discovery and the final hearing and to determine whether the issues the cases

---

[30] If the two doses did not suffice, "further doses of midazolam" would be administered "as required." *Id.* at 4.

presented differed from those pending in *Arthur* that would be tried in January 2016.  Order at 1–2, *Frazier v. Myers*, No. 2:13-cv-781 (M.D. Ala. Oct. 8, 2015).

The ADOC answered the Complaint as ordered.  The answer responded to the Complaint paragraph by paragraph and denied the material allegations of Frazier's Eighth Amendment claim, including the allegation that two of the drugs included in Frazier's proposed alternative method of execution, sodium thiopental and compounded pentobarbital, were available.  The answer admitted that midazolam was available and stated that the "Defendants have agreed to provide Frazier with an execution utilizing a single drug, midazolam, as set forth in his complaint."  The answer also asserted eighteen affirmative defenses, including that Frazier's Eighth Amendment claim "fail[ed] to state a claim for relief," was "barred by sovereign immunity," and was "barred by *res judicata*."[31]

_____

[31] The ADOC raised the following affirmative defenses in its response to Frazier's complaint:

A. This action is barred by the two-year statute of limitation applicable to such claims.

B. This action is moot inasmuch as Defendants have agreed to provide Frazier the midazolam-only alternative execution he seeks in his complaint.

C. This action is barred by ban on successive habeas corpus actions inasmuch as Frazier, in paragraph 53, attacks Alabama's method of execution "on its face."

D. This action fails to state a claim for relief as a matter of law.

E. Plaintiff's claim is barred by sovereign immunity.

F. Plaintiff's claim is barred by res judicata.

G. Plaintiff's claim is barred by waiver and estoppel.

H. Plaintiff lacks standing.

I. Plaintiff has unclean hands.

J. Plaintiff is not entitled to the relief he seeks.

K. Plaintiff's complaint is barred by laches.

18

On November 5, 2015, following the status conference, the Court entered an order consolidating Appellants' cases.  On November 20, 2015, the Court issued a "Final Scheduling Order," scheduling the cases for trial before the Court on April 19–22, 2016; setting deadlines of February 5 and March 18, 2016 for "fact discovery" and  "expert discovery," respectively; and directing that dispositive motions be filed by March 25, 2016.  On March 16, 2016, the Court granted the parties' joint motion to extend the deadline for deposing expert witnesses through April 5, 2016.

---

L. Alabama's lethal injection protocol does not violate basic principles of human dignity or contemporary standards of decency.

M. Alabama's lethal injection protocol does not amount to intentional, reckless indifference to acts violating any party's constitutional rights.

N. Any interest Frazier has in pursuing his claim is outweighed by the State's interest in finality of duly-adjudicated criminal judgments, the timely administration of death sentences, guarding against a flood of similar claims, and ensuring closure for victims, their families, and the public.

O. Alabama's method of carrying out a sentence of death by lethal injection does not cause or expose a condemned person to an unnecessary or substantial risk of serious harm, and Defendants deny that lethal injection as administered in Alabama violates any party's constitutional rights.

P. A lethal injection is not a medical procedure requiring the same safeguards and oversight as medical procedures, and an execution by lethal injection is not governed by rules and regulations applying to medical procedures.

Q. Frazier's Eighth Amendment rights have not been, and will not be, violated.

R. Defendants deny any claim or allegation of Frazier's amended complaint that is not expressly admitted above.

Although the ADOC raised all of these items as affirmative defenses, many were actually simple denials or objections to the sufficiency of Frazier's claim.  Rule 8(c) provides that "a party must affirmatively state any avoidance or affirmative defense."  Fed. R. Civ. P. 8(c).  Of the eighteen claims the ADOC raised, only eight were avoidance or affirmative defenses.  Those were letters A, B, C, F, G, I, K, and N above.  Letters D, E, and H addressed alleged insufficiencies in the complaint.  Finally, letters J, L, M, O, Q, P, and R were simply denials that should not have been raised as defenses.

19

*Arthur* was tried to the District Court on January 12 and 13, 2016. *See*

*Arthur*, 840 F.3d at 1278. The evidence before the Court consisted mainly of the

testimony and documents introduced during the evidentiary hearing on October 18

and 19, 2012 and deposition testimony taken during discovery conducted after that

hearing. *See Arthur v. Dunn*, No. 2:11-cv-438, 2016 WL 1551475 (M.D. Ala. Apr.

15, 2016), *aff'd sub nom.*, *Arthur v. Comm'r, Ala. Dep't. of Corr.*, 840 F.3d 1268

(11th Cir. 2016). The District Court rendered its decision on April 15, 2016. In its

findings of fact,[32] the Court found that "[p]entobarbital is not feasible and readily

implemented as an execution drug in Alabama, nor is it readily available to the

ADOC, either compounded or commercially," and that "[s]odium thiopental is

unavailable to the ADOC for use in lethal injections." *Id.* at *8–9.

In its conclusions of law, the Court held that although the plaintiff

"sufficiently pleaded an Eighth Amendment claim," he "failed to prove" that either

compounded pentobarbital or sodium thiopental was "readily available to the

ADOC" for use in the single-drug protocols he proposed as alternative execution

methods. *Id.* at *9–10. Because that failure doomed the plaintiff's claim, the

Court did not have to, and accordingly did not, decide whether the ADOC's

implementation of the current three-drug protocol, with midazolam acting as the

---

[32] *See* Fed. R. Civ. P. 52(a) (generally requiring a court trying an action without a jury or advisory jury to "find the facts specially and state its conclusions of law separately").

20

first drug, created a "substantial risk of serious harm"[33] to a prisoner during execution.

On February 26, 2016, while the decision in *Arthur* was still pending, the ADOC moved the District Court for summary judgment on Appellant's Eighth Amendment claims in the Midazolam Litigation. On March 16, the Court granted the parties' joint motion to extend the discovery deadline to April 5. On April 15, Appellants responded to the ADOC's motion for summary judgment.

The trial scheduled for April 19–22, 2016 did not take place.[34] Instead, the District Court took the ADOC's motion for summary judgment under submission. On October 31, 2016, it granted the motion. It did so because the "Plaintiffs failed to meet their burden of proof to survive summary judgment." It observed that "Plaintiffs clearly bear the burden of proving a *known* and *available* alternative *method of execution* that *significantly* reduces the risk of *substantial pain* in the execution" and concluded they failed to meet that burden in that they "failed to present evidence that creates a genuine dispute of material fact as to an alternative method of execution, an essential prong of the *Baze/Glossip* test for an Eighth Amendment method-of-execution claim."

---

[33] *Baze*, 553 U.S. at 50, 128 S. Ct. at 1531.

[34] On April 28, 2016, the District Court entered an order consolidating with the cases in the Midazolam Litigation five cases that had been filed less than two weeks earlier in the Middle District of Alabama by prisoners mounting the same Eighth Amendment challenge to the current three-drug protocol Appellants presented. These prisoners were represented by another Assistant Federal Defender, Spencer Jay Hahn. Their cases are now pending before this Court on appeal.

The District Court reached this conclusion with respect to Appellants' proposed single-drug protocol based on the testimony of the ADOC's General Counsel, Anne Adams Hill.[35]  In deciding to credit Hill's testimony and then weigh it against Appellants' proof, the District Court functioned as a finder of fact and ultimate decision maker and therefore erred.  *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.").  The Court performed the same role when it determined the credibility of testimony and weighed the evidence in summarily disposing of Appellant's midazolam proposal.

In Part III, we conclude that the District Court's resolution of credibility issues and its weighing of the evidence requires the vacation of its summary judgment.  In Part IV, we consider and reject as meritless the ADOC's arguments that Appellants' Eighth Amendment claims were both untimely and barred by the law-of-the-case doctrine.  Part V relates to the proceedings on remand.

## III.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

[35] Hill became the ADOC's general counsel in March 2011.  *Arthur v. Dunn*, No. 2:11-cv-438, 2016 WL 1551475, at *7 (M.D. Ala. Apr. 15, 2016).

that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "The movant has the burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2514 (1986). In deciding whether to grant summary judgment, a district court "'may not weigh conflicting evidence or make credibility determinations.'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011)). With these principles in hand, we turn to the District Court's summary disposition of Appellant's Eighth Amendment claims based on its determination that none of the three alternative modes of execution, single-drug protocols consisting of compounded pentobarbital, sodium thiopental or midazolam respectiviely, satisfies *Glossip*'s requirement that such alternatives be "feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737. We begin with compounded pentobarbital.

## A.

The District Court began its discussion about the availability of compounded pentobarbital by harkening back to the findings of fact and conclusions of law it made following the *Arthur* trial. The Court recalled that it had found that "the ADOC's supply of commercially manufactured pentobarbital, Nembutal®, expired

23

around November 2013," and that "compounded pentobarbital" was unavailable to the ADOC as an alternative single-drug protocol.

In finding compounding pentobarbital unavailable, the Court had to resolve the conflicting testimony of Gaylen M. Zentner, Ph.D, a pharmacist,[36] and testimony that Anne Adams Hill, the ADOC's general counsel, previously gave at the *Arthur* trial in January 2016. *See Arthur*, 2016 WL 15514175, at *4–7.

Dr. Zentner testified that "pentobarbital sodium for injection is listed in the FDA Orange Book, a publication containing all approved drugs in the United States," and because no active patents covered the product, "anyone who has the ingredients can make pentobarbital sodium." *Id.* at *5. He performed an internet search for the drug and found a company that in its products list identified the drug as available for purchase in the United States. *Id.* at *6. He also noted that "there are overseas suppliers of pentobarbital sodium and that pentobarbital sodium could be produced by drug synthesis labs in the United States." *Id.* As for compounding pharmacies in Alabama, Dr. Zentner "testified that he searched the website of the Accreditation Commission for Health Care (ACHC) for accredited compounding pharmacies" and identified nineteen within the State. *Id.*

---

[36] Dr. Zentner held a M.S. degree in pharmacy and a Ph.D. degree in pharmaceutics, and had taught for several years at the college level and in the compounding laboratory. *See Arthur*, 2016 WL 15514175, at *4. He was an "independent consultant to the pharmaceutical industry." *Id.* The District Court found Dr. Zentner qualified as an expert in "pharmaceutical chemistry, pharmaceutical manufacturing, and compounding." *Id.*

24

Dr. Zentner also indicated that the ADOC should be able to obtain compounded pentobarbital from sources outside of Alabama, opining,

> because other states have obtained compounded pentobarbital, it should also be available from those pharmacies in the other states and that any pharmacy that is qualified to do sterile compounding and has the necessary equipment could be a source of supply, as the compounding exercise is "very easy and straightforward."

*Id.* (quoting Dr. Zentner).  The District Court seemed skeptical.

> Zentner's carefully qualified answer to the last question put to him on direct examination reveals the tepid and inexact nature of his opinion concerning whether pentobarbital is available to the ADOC:
>
>> A. My opinion is that the active pharmaceutical ingredient, which is pentobarbital sodium, is available for purchase in the United States and that there are compounding pharmacies that have the skills and licenses to perform sterile compounding of pentobarbital sodium. Therefore, the feasibility for producing a sterile preparation of pentobarbital sodium does exist.

*Id.* (quoting Dr. Zentner).  Despite its apparent skepticism, the Court still found Dr. Zentner's testimony "credible."  *Id.* at *7.

In *Arthur*, Hill testified as "the ADOC's party representative." *Id.*  In the Memorandum Opinion and Order here under review, the Court reiterated its description of her testimony in *Arthur*.

> Hill . . . testified [that] [s]he was aware that in 2015, Georgia, Missouri, Texas, and Virginia performed executions using compounded pentobarbital [and] that, in her recent efforts to obtain compounded pentobarbital for the ADOC's use in executions, she had contacted the departments of corrections in at least those four states.

25

Elaborating, Hill testified that, as part of her job duties, she is routinely in contact with other departments of corrections on a variety of issues, including the subject of lethal injection generally, the availability of compounded pentobarbital, and, in those states that have been able to obtain compounded pentobarbital, their willingness either to provide it to the ADOC or to provide their source to the ADOC. She reiterated that she has had these similar, ongoing, conversations not just recently, but "for some time."

In her quest to find a source for compounded pentobarbital, Hill has also contacted all eighteen accredited compounding pharmacies in Alabama, but her efforts were to no avail. "[N]one of the 18 were able to provide the Department of Corrections with compounded pentobarbital." In all, she has contacted at least twenty-nine potential sources to inquire about obtaining compounded pentobarbital, and all of those efforts failed.[37]

After reiterating its description of Hill's testimony, the Court went on to say that, in *Arthur*, it "credited Hill's testimony and made the following findings of fact concerning pentobarbital and compounded pentobarbital":

---

[37] Hill's testimony was introduced in the form of a transcript from the *Arthur* trial, which the ADOC presented in support of its motion for summary judgment. Hill's testimony was rank hearsay. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (internal quotation marks omitted).

The ADOC offered the testimony to prove the truth of the matter asserted: compounded pentobarbital was unavailable. Not only was the testimony hearsay on its face, it contained the hearsay of individuals Hill said she contacted in an effort to obtain the drug. Their statements were implicit in Hill's statement that her efforts to obtain the drug from those contacted or from their sources "failed." The contacts' statements were, for example, that they would not identify their sources of compounded pentobarbital or would not provide the ADOC with a portion of their supply of the drug.

Appellants did not move the Court to strike Hill's testimony as hearsay, and we find no objection to its admissibility in Appellants' submission to the Court in opposition to the ADOC's motion for summary judgement.

26

8. The ADOC has attempted to obtain compounded pentobarbital for use in executions from departments of corrections in at least four states, Georgia, Missouri, Texas, and Virginia, but those efforts were unsuccessful.

9. The ADO has contacted all of the accredited compounding pharmacies in Alabama to ascertain whether any of these pharmacies would be willing and able to provide compounded pentobarbital to the ADOC, but those efforts have been unsuccessful.

10. Pentobarbital is not feasible and readily implemented as an execution drug in Alabama, nor is it readily available to the ADOC, either compounded or commercially.

In passing on the ADOC's motion for summary judgment, the District Court, relying on Hill's *Arthur* testimony, adopted the facts depicted in paragraphs 8–10 above and examined the record for evidence indicating that at some time between the conclusion of the *Arthur* trial on January 13, 2016, and the date the Court took the ADOC's motion under submission,[38] the availability picture had changed. The Court appeared to ask itself the following question: Had the Plaintiffs presented evidence showing that compounded pentobarbital, though unavailable to the ADOC as of January 13, 2016, could now be obtained?

In an effort to show that the drug was available, Appellants relied on "the report and testimony of their expert, Deborah L. Elder, Pharm. D," a "Clinical Associate Professor in the Pharmaceutical and Biomedical Department in the College of Pharmacy at the University of Georgia" who was certified "in

---

[38] The Court granted the ADOC's motion on October 31, 2016. The record does not indicate when it took the motion under submission.

compounding" under Georgia law.[39] They also relied on the Complaint's factual representations that other states had been able to obtain the drug.[40]

The Court found Dr. Elder's report and testimony unhelpful to Appellants' cause because, at the end of the day, she was unable to "identify any pharmacist or supplier who could provide compounded pentobarbital to the ADOC." The Complaint's representations that other states were able to obtain the drug was also unhelpful to Appellants in establishing that the drug was available to the ADOC. The Court found it "inconsequential" that in several states "since January 1, 2014, nearly forty executions had been performed 'using a single large dose of pentobarbital.'"[41] Moreover, "that the drug was available in those states at some point over the past two years d[id] not, without more, make it likely that it [was] available to Alabama now." It was also inconsequential that several states "intend to use compounded pentobarbital for executions."[42] Given these findings, the District Court concluded that its "earlier finding in *Arthur* that pentobarbital, either

_____

[39] Dr. Elder's report is dated February 11, 2016. Her testimony was taken by deposition on April 5, 2016.

[40] *See supra* notes 14–23. That fact and most of the other facts the Complaint recited (that were extraneous to the statement of the plaintiff's Eighth Amendment claim) depicted events that took place prior to the *Arthur* trial and thus were available to plaintiff's counsel in that case. As indicated in Part III.B., *infra*, the District Court concluded that the Complaint's factual assertions failed to provide the proof Appellants needed to overcome the findings and conclusions on which *Arthur* was founded.

[41] The ADOC's answer to the Complaint admits that "forty-two executions have been carried out using a one-drug pentobarbital protocol since January 1, 2014."

[42] The ADOC's answer to the Complaint admits that a number of States "intend to use" pentobarbital as a one-drug protocol but "submits" that that fact "is irrelevant."

compounded or commercially manufactured, [was] not readily available to the

ADOC" was "unchanged by the additional evidence [Appellants] offered."  More

to the point, "[p]laintiffs' evidence obtained after Hill's testimony in the *Arthur*

trial in January 2016[] fail[ed] to establish that compounded pentobarbital ha[d]

since become available to the ADOC."

*          *          *

The Complaint, which was filed on August 25, 2015, alleges that "a single

bolus of [compounded] pentobarbital . . . is read[ily] available" to the ADOC.  The

District Court, adopting findings of fact it made in *Arthur*,[43] found that

compounded pentobarbital was not available on August 25, 2015; indeed, the drug

was not available as of January 13, 2016, the day the *Arthur* trial concluded.  Thus,

to create a genuine issue of fact, Appellants had to demonstrate that the drug

became available at some point between January 13, 2016, and the day the Court

took the ADOC's motion for summary judgment under consideration.[44]  The Court

concluded Appellants failed to do so.

In precluding Appellants from challenging its *Arthur* finding that

compounded pentobarbital was unavailable to the ADOC prior to January 13,

2016, the District Court did not identify the principle of law it was invoking.  The

---

[43] As indicated in the text, *supra*, these findings were based on Hill's testimony in *Arthur*.

[44] *See supra* note 38.

Court apparently had two doctrines in mind: issue preclusion and judicial notice.[45]

Although superficially each doctrine might seem relevant, we conclude neither was

applicable.

> Issue preclusion comes into play when:
>
> (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior suit was a necessary part of the judgment in that action; and (4) the parties are the same or in privity with each other and the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.[46]

*Baloco v. Drummond Co*., 767 F.3d 1229, 1251 (11th Cir. 2014).

Issue preclusion, like claim preclusion, is an affirmative defense under

Federal Rule of Civil Procedure 8(c).  *See Concordia v. Bendekovic*, 693 F.2d

1073, 1075 (11th Cir. 1982) (explaining that issue preclusion is "an affirmative

defense that should be raised under Rule 8(c)").[47]  It is "incumbent on the

---

[45] The preclusive effect of the *Arthur* judgment is determined by federal common law, and is "defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171 (2008). "Claim preclusion describes the rules formerly known as 'merger' and 'bar,' while issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" *Id.* at n.5.

[46] The "issue at stake" once the *Arthur* findings of fact are disregarded was whether compounded pentobarbital was feasible and readily available to the ADOC as a one-drug injection protocol at the time the Complaint was filed, on August 25, 2105.  The issue was not whether the drug became available after January 13, 2016.

[47] Rule 8 provides, in relevant part:  "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . estoppel . . . [and] res judicata."  Fed. R. Civ. P. 8(c)(1).

defendant to plead and prove such a defense" in answering the plaintiff's complaint. *Taylor*, 553 U.S. at 907, 128 S. Ct. at 2179–80.

The ADOC could not rely on issue preclusion for two reasons. First, it failed to plead the doctrine as an affirmative defense. The ADOC filed its answer to the Complaint on October 22, 2015, and could not have pled the defense because it was not available. *Arthur* had not been decided. *See Arthur*, 2016 WL 1551475, at *1. After *Arthur* was decided on April 15, 2016, the ADOC could have sought leave to amend its answer, but did not.

Second, the defense was not available to the ADOC because the parties in Arthur and Appellants' cases were not "the same," and Arthur and Appellants were not in privity, i.e., no exceptions to the rule against nonparty preclusion applied to make *Arthur* binding in Appellants' cases. The general rule, set forth long ago by the Supreme Court, states that "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Martin v. Wilks*, 490 U.S. 755, 762, 109 S. Ct. 2180, 2184 (1989) (footnote omitted). Six exceptions to this rule have been recognized:

> A court may apply nonparty preclusion if: (1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the suit; (4) the nonparty assumed control over the litigation in which the judgment was issued; (5) a party attempted to relitigate issues through a proxy; or (6) a statutory scheme foreclosed successive litigation by nonlitigants.

31

*Griswold v. Cty. of Hillsborough*, 598 F.3d 1289, 1292 (11th Cir. 2010) (citing

*Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161, 2172–73, (2008)).  Collectively,

these exceptions are commonly described using the catchall term "privity."  *E.g.*,

*Taylor*, 553 U.S. at 895 n.8, 128 S. Ct. at 2172 n.8.

None of those exceptions apply here.  Nothing in the record indicates—and

the District Court did not find or imply—that Appellants consented to be bound by

*Arthur*'s resolution, had any legal relationship with Arthur, were represented by

him in any capacity, or had any control over his claim.  Nor is there any suggestion

Arthur was attempting to relitigate his claim by using Appellants as proxies.  And

no statute prevents successive nonparty litigation in this context.  *Arthur* can

therefore have no preclusive effect in Appellants' cases.

Nor could the District Court rely on judicial notice to make its findings in

*Arthur* conclusive in Appellants' cases.  A district court may take judicial notice of

an adjudicative fact[48] that is both "not subject to reasonable dispute" and either (1)

---

[48] An "adjudicative fact" is, generally speaking, a fact in issue or facts from which such fact may be inferred.  *See* 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5103.3 (3d ed. 2016).  The adjudicative facts the District Court noticed and relied on included the *Arthur* findings, which were based on Hill's hearsay testimony, that:

> 8. The ADOC has attempted to obtain compounded pentobarbital for use in executions from departments of corrections in at least four states, Georgia, Missouri, Texas, and Virginia, but those efforts were unsuccessful.

> 9. The ADOC has contacted all of the accredited compounding pharmacies in Alabama to ascertain whether any of these pharmacies would be willing and

32

"generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).[49]  "Indisputability is a prerequisite."  *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5104 at 485 (1977 & Supp. 1994)).  "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of [issue preclusion] would be superfluous."  *Id.*; *see also Gen. Elec. Capital v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (explaining "we cannot allow a court to achieve through judicial notice what it cannot achieve through

---

able to provide compounded pentobarbital to the ADOC, but those efforts have been unsuccessful.

10. Pentobarbital is not feasible and readily implemented as an execution drug in Alabama, nor is it readily available to the ADOC, either compounded or commercially.

[49] Rule 201, Judicial Notice of Adjudicative Facts, states in pertinent part:
(a) Scope. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.
(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:
(1) is generally known within the trial court's territorial jurisdiction; or
(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.
(c) Taking Notice. The court:
(1) may take judicial notice on its own; or
(2) must take judicial notice if a party requests it and the court is supplied with the necessary information.
Fed. R. Civ. P. 201.

[issue preclusion]"); *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (noting that instances where a factual finding from another court could satisfy Rule 201's indisputability requirement for judicial notice would be rare).  In reaching that conclusion, the *Taylor* Court drew on decisions of the Second,[50] Eighth,[51] and Eleventh Circuits,[52]  explaining that all of those circuits had held that "even though a court may take judicial notice of a 'document filed in another court . . . to establish the fact of such litigation and related filings,' a court cannot take judicial notice of factual findings of another court."  *Taylor*, 162 F.3d at 830 (citation omitted).

Whether compounded pentobarbital was feasible and "readily available" to the ADOC as a single-drug protocol was a factual issue in *Arthur*.[53]  So was the credibility of Hill's testimony that the ADOC had been unable to obtain the drug. That the District Court, in *Arthur*, found for the ADOC on both issues did not transform the findings into indisputable adjudicative facts subject to judicial notice.

---

[50] *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F. 2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F. 2d 767, 774 (2d Cir. 1991)) (explaining "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings'") (citation omitted).

[51] *See Holloway v. Lockhart*, 813 F.2d 874, 879 (8th Cir. 1987) (noting that while the fact that a particular factual finding was made in another case was judicially noticeable, the underlying factual finding was not).

[52] *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (finding that judicial notice of factual findings from other court proceedings is generally inappropriate).

[53] *Arthur*, 2016 WL 1551475, at *6.

Putting aside the doctrines of issue preclusion and judicial notice and disregarding the *Arthur* findings of fact, the question becomes whether the record before the Court reveals a genuine factual dispute regarding the availability of compounded pentobarbital. When we place the evidence proffered by the Appellants and the ADOC on the two sides of the scale, we find a factual dispute the Court could not resolve on summary judgment.

On Appellants' side are the facts that since January 1, 2014, forty-two executions had been carried out using a one-drug pentobarbital protocol,[54] and that several States intended to use compounded pentobarbital as a one-drug protocol. The District Court considered these facts "inconsequential." We disagree. From these facts it can reasonably be inferred that compounded pentobarbital was available, that executions using the drug as a one-drug protocol were ongoing, and that several States contemplated employing the protocol.

On the ADOC's side are these facts. On January 12, 2016, while testifying in the *Arthur* trial, Hill revealed that in 2015, Georgia, Missouri, Texas, and Virginia performed executions using compounded pentobarbital.[55] She contacted "departments of corrections . . . in those [and other] states that have been able to

---

[54] The ADOC admitted this fact in its answer to Frazier's complaint.

[55] Based solely on her testimony, the District Court declared that it was "undisputed that in 2015, only four states—Georgia, Missouri, Texas, and Virginia—were able to perform executions using compounded pentobarbital."

35

obtain compounded pentobarbital [regarding] their willingness either to provide it to the ADOC or to provide their source to the ADOC." Her conversations with these departments were "ongoing, . . . not just recently, but 'for some time.'"[56] What she learned about the availability of compounded pentobarbital during these conversations she did not say.

Hill testified she contacted "at least twenty-nine potential sources" of compounded pentobarbital, inquiring whether they could provide the ADOC with the drug. Of those sources, eighteen consisted of the accredited compounding pharmacies in Alabama. She reported that none of these sources were able to provide the ADOC with the drug. Hill did not specifically identify any of the sources she contacted, or provide any details regarding the conversations she had with potential suppliers of compounded pentobarbital. What she did say was that all of her efforts failed.

Notwithstanding the lack of specificity provided by Hill's testimony, the District Court found it credible and, moreover, that it conclusively "rebutted Arthur's allegation that compounded pentobarbital was an available alternative." Whether her testimony was credible and whether it tipped the scale in the ADOC's favor was a matter for a trier of fact. *See Strickland v. Norfolk Southern Ry. Co.*,

_____

[56] Ms. Hill testified in January 2016. Therefore, her testimony did not and could not establish that compounded pentobarbital was still unavailable to the ADOC in the interval between her testimony in *Arthur* (January 2016 and the time when the Court took the ADOC's motion for summary judgment under consideration.

36

692 F.3d 1151, 1162 (11th Cir. 2012) (holding that when credibility is at issue "summary judgment is simply improper"); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (explaining "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment").  Hill's testimony that she sought compounded pentobarbital in fall 2015, a full year after the State switched to midazolam, is open to multiple inferences.  When asked why she was attempting to find a source for the drug after the switch to midazolam, she testified that "[i]f at some point . . . I was able to determine that there was compounded pentobarbital available to us, then at that time, we would determine whether or not to amend our protocol and add that as an alternative."  One inference from this testimony is that the ADOC was concerned about midazolam's adequacy as a substitute for pentobarbital.  Hill did not have final decisionmaking authority over the State's execution protocol; she was the ADOC's general counsel and was testifying as a representative of the ADOC.

Therefore, a factfinder could reasonably infer that her efforts to find a new pentobarbital source reflected her or her superiors' doubts about midazolam's effectiveness in eliminating pain potassium chloride could cause during executions.  Of course, other inferences from Hill's testimony could be drawn, and

that is precisely why her testimony should be been submitted to the trier of fact

rather than treated as conclusive on summary judgment.

When we consider the District Court's reliance on findings of fact it made in

*Arthur* and its determination of the credibility of critical testimony, the conclusion

is inescapable that the Court erred in holding that Appellants failed to create an

issue of fact as to whether the ADOC could obtain compounded pentobarbital.

B.

In *Arthur*, the District Court made the following findings of fact regarding

the availability of sodium thiopental to the ADOC:

> 11. Per the FDA Orange Book, sodium thiopental is no longer legally available in the United States.
>
> 12. While sodium thiopental may be available from an overseas supplier and could conceivably be imported into the United States, such importation requires the approval of the FDA. There was no evidence at trial that any state's department of corrections had obtained the FDA's approval to import sodium thiopental for use in performing its executions.
>
> 13. Sodium thiopental is unavailable to the ADOC for use in lethal injections.

*Arthur*, 2016 WL 1551475, at *9.  Based on these findings the Court reached the

following conclusion of law:

> Arthur . . . failed to carry his burden to establish that sodium thiopental is an alternative drug that is available to the ADOC for use in his execution. Sodium thiopental is not currently an approved drug that is legally available in the United States. Evidence of its

38

availability from an overseas supplier is insufficient to satisfy *Glossip*'s requirements.

*Id.* at \*10.

In granting the ADOC's motion for summary judgment on the availability of sodium thiopental in the Midazolam Litigation, the District Court considered whether the evidence Appellants presented in opposition to the motion was sufficient to overcome the findings of fact it made in resolving the issue in *Arthur*. The Court determined that the evidence was insufficient.

> Plaintiffs' proof of the availability of sodium thiopental is similar to the proof offered in the *Arthur* trial in January 2016, in that Plaintiffs have only provided evidence that sodium thiopental *may* be available from an overseas supplier and could conceivably be imported into the United States, but only with the FDA's approval. . . . In short, Plaintiffs' evidence obtained after the *Arthur* trial in January 2016, fails to establish that sodium thiopental has since become available to the ADOC.

*        *        *

In resolving the sodium thiopental issues, the District Court committed the same error it made in resolving the compounded pentobarbital issues. It relied on its *Arthur* findings as if it were invoking the doctrines of issue preclusion or judicial notice and, at summary judgment, weighed those findings against the evidence presented in the case before it. As we have explained, neither doctrine justifies such reliance in this context.

39

In *Arthur*, whether the ADOC could obtain sodium thiopental was disputed. The Court resolved the dispute by weighing the testimony of Dr. Zentner[57] and Anne Hill.  Dr. Zentner testified that although sodium thiopental was "no longer listed in the FDA Orange Book, . . . it was his general understanding that sodium thiopental [wa]s available offshore and conceivably could be imported."  *Arthur*, 2016 WL 1551475, at \*6.  The District Court found his "testimony . . . credible." *Id.* at \*7.  Hill disagreed with Dr. Zentner.  She testified,

> after the ADOC adopted a drug protocol that included midazolam, she made no effort to obtain sodium thiopental and no effort to determine if it could be legally imported for the ADOC's use in executions. Further, to her knowledge, sodium thiopental [was] not available in the United States, and she [was] unaware of any state that [had] imported sodium thiopental for use in executions.

*Id.* at \*7.  Hill, as the ADOC's general counsel, was "responsible for developing, proposing, and maintaining the ADOC's execution protocol."  *Id.* at 8.  But she was not "the final decision and policymaker concerning the ADOC's execution protocol."  *Id.*  Instead, "the final decision maker [was] the ADOC's Commissioner."  *Id.*

The Court also found Hill's testimony credible.  *Id.*  We assume that the Court found each witness's testimony probative of the availability or unavailability of sodium thiopental; otherwise, the District Court would have had no need to

---

[57] The Court's Memorandum Opinion and Order cites some of Dr. Zentner's testimony in *Arthur*.  We assume that the Court considered his testimony as part of the record on summary judgment.

40

make a credibility determination.  Thus, in deciding whether sodium thiopental was available to the ADOC, the Court must have weighed the testimonies of the two witnesses who spoke to the issue, Hill and Dr. Zentner.  Dr. Zentner was a pharmacist, an "independent consultant to the pharmaceutical industry."  *Id.* at 4. Hill was not.  Dr. Zentner testified that sodium thiopental was available offshore and conceivably could be imported even though it was no longer listed in the FDA Orange Book.  *Id.* at 6.  Hill testified that after the ADOC adopted the current protocol, she "made no effort to obtain sodium thiopental and no effort to determine if it could be legally imported."  *Id.* at *7.  Nonetheless, she testified that, "to her knowledge," the drug was not available in the United States.  *Id.*

In its findings of fact, the Court found—on the basis of Dr. Zentner's testimony—that "sodium thiopental may be available from an overseas supplier" and "conceivably" importable.  *Id.* at *9.  Hill's testimony did not negate that fact.[58]  But since "[t]here was no evidence at trial that any state's department of corrections had obtained the FDA's approval to import sodium thiopental for use in performing its executions," the Court concluded that the plaintiff, Arthur, failed

_____

[58] Indeed, Hill's testimony could not negate Dr. Zentner's testimony.  The District Court treated Hill's testimony as conclusive in establishing that sodium thiopental was unavailable from the time the ADOC switched to midazolam to the time Hill testified.  It thus considered only whether Appellants' evidence established that sodium thiopental became available to the ADOC after Hill testified in January 2016.  But Hill's testimony could not establish sodium thiopental's unavailability in any time period after the ADOC replaced sodium thiopental with pentobarbital, because a trier of fact could infer from her testimony that neither she nor the ADOC ever sought sodium thiopental after the State switched to pentobarbital.

to satisfy his burden of proving that sodium thiopental was available to the ADOC. *Id.* at \*9–10. However, the District Court arrived at that conclusion after weighing the conflicting testimony and evidence presented in that case.

The procedural posture of this case demands a different outcome because trial courts are expressly forbidden from engaging in this type of evidentiary weighing. *See, e.g.*, *Mize*, 93 F.3d at 742 (noting that at summary judgment, "[i]t is not the court's role to weigh conflicting evidence"). Thus, the District Court erred in resolving the dispute over the availability of sodium thiopental by judging the credibility of the witnesses' testimony and then weighing that testimony, along with the other evidence in the record, to decide the ultimate fact—the availability of sodium thiopental. *See Jones*, 683 F.3d at 1292 ("If the record presents disputed issues of fact, the court may not decide them; rather, we must deny the motion and proceed to trial.") (alteration omitted) (quoting *FindWhat Investor Grp.*, 658 F.3d at 1307). For that reason, the District Court's determination that there was no genuine issue of material fact regarding the unavailability of sodium thiopental was erroneous and must be set aside.

## C.

Whether the use of midazolam in a single-drug protocol satisfied *Baze*'s feasible-alternative standard was not before the District Court in *Arthur*. The

42

District Court therefore resolved the issue without reference to its *Arthur* decision.[59]

Frazier's Complaint expresses Appellants' alternative proposal as "a single dose of midazolam." The Complaint states that, according to the finding of a federal district court in Oklahoma, "a 500mg dose of midazolam will likely cause death in under an hour." [60] The Complaint also states that the "Defendants' own expert endorses this [alternative] method."[61]

The District Court read the Complaint's allegation as follows: "Plaintiffs' third proposed alternative is a 500-mg dose of midazolam administered in a single-drug protocol."[62] Since the ADOC had a supply of midazolam on hand, the

---

[59] As indicated in part II, *supra*, Appellants attached to their operative complaints as Exhibits A and B, a transcript of the hearing held in *Arthur* on October 18–19, 2012. But whether the Court drew on anything in that transcript in determining whether Appellants' midazolam proposal was sufficient to survive the ADOC's motion for summary judgment is doubtful.

[60] The Complaint goes on to allege that "the District Court in Oklahoma found that a 500mg dose of midazolam will likely cause death in under an hour . . . based on the testimony of Dr. Evans, the Defendants' expert in that case." The Complaint substantiates this allegation in a footnote citing the Supreme Court's recitation of facts previously found by the District Court in *Glossip*. Although the allegation has no bearing on whether the Complaint states an Eighth Amendment claim, *see supra* notes 14–23 and accompanying text, the drafter apparently thought it would be probative of such a claim via its implicit invocation of the doctrines of issue preclusion and judicial notice.

[61] The Complaint does not identify the "Defendants' own expert." We infer from the parties' submissions on summary judgment and Appellants' opening brief on appeal that the expert was Daniel Buffington, Pharm.D.

[62] The District Court reframed the Complaint's alternative proposal to mirror the district court's finding in *Glossip*. *See Glossip*, 135 S. Ct. at 2736 (noting that the district court had previously found that "a 500-milligram dose [of midazolam] alone would likely cause death by respiratory arrest within 30 minutes or an hour").

43

availability of the drug was not an issue.  Given its interpretation of the

Complaint's alternative proposal, the Court's task was to decide whether the record

established for summary judgment purposes that a 500-milligram dose of

midazolam would "significantly reduce a substantial risk of severe pain."  *Glossip*,

135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 52, 128 S. Ct. at 1520).

According to the deposition testimony of Randall Tackett, Ph.D,[63] "a 500-

mg dose of midazolam [was] too low, presumably to cause death."  Instead,

Tackett explained,

> if midazolam were used in a one-drug protocol, he would recommend
> a loading dose of between 2.5 and 3.75 grams, the equivalent of
> between 2500 and 3750 milligrams of midazolam, a dose five to eight
> times larger than the 500-milligram dose Plaintiffs have pled as an
> alternative method of execution. [He] also recommended that this
> loading dose should be followed by continuous infusion until death.[64]

Based on this testimony, the Court concluded that

> [t]he opinion of Plaintiffs' own expert that a 500-mg dose of
> midazolam is too low refutes the feasibility of Plaintiffs' proposed
> alternative, and there is no other scientific evidence of record to
> support this novel alternative.  Dr. Tackett's report and opinion fail to
> support, and in fact undermine, Plaintiffs' claim that a 500-mg dose of
> midazolam in a one-drug protocol would result in significantly less
> risk of substantial pain than Alabama's present protocol, as *Glossip*
> requires. Plaintiffs also have failed to raise a genuine dispute of

---

[63] "Dr. Tackett . . . is a professor at the University of Georgia (UGA) College of
Pharmacy in the Department of Clinical and Administrative Pharmacy."

[64] Dr. Tackett gave an opinion with "a reasonable degree of scientific certainty" that the
"one-drug midazolam protocol [referenced in his report and testimony] would lead to a humane
death."  He testified that "depending on the rate of infusion . . ., someone would probably expire
within probably five to ten minutes, definitely by half an hour."

material fact that a 500-mg dose of midazolam in a single-drug protocol is a feasible alternative that is readily implemented.

\*            \*            \*

The District Court reached this dispositive conclusion after assessing the credibility of Dr. Tackett's testimony and then weighing it against the contrary evidence the record presented, including testimony by the ADOC's expert, Dr. Daniel Buffington, a clinical pharmacologist and faculty member at the University of South Florida Colleges of Medicine and Pharmacy and the President and Practice Director for Clinicial Pharmacology Services in Tampa, Florida. Although Dr. Buffington's testimony was in the record, the Court overlooked it.[65] Dr. Buffington testified that "500mg of midazolam in a bolus as provided for in [Alabama's current three-drug] protocol [would] be sufficient on its own to cause death," noting that 500mg is "multiple times the toxic range for midazolam and there are deaths [at dosages] as low as 10[mg] to 50 [mg]."

In addition to Dr. Buffington's testimony, the Court overlooked statements the ADOC made in its motion to dismiss Frazier's complaint. *See Frazier v. Myers*, No. 2:13-cv-00781 (M.D. Ala. Sept. 25, 2015).[66] The ADOC stated that it would consent to a judgment that "suspend[s] the current lethal-injection protocol"

---

[65] The Court's Memorandum Opinion and Order contains no reference to Dr. Buffington or his testimony.

[66] The same pleading was filed in response to the other Appellants' complaints as well. *See supra* Part II.

45

and utilizes midazolam as the sole drug in Alabama's execution protocol. *Id.* at 4.[67] "After an initial 500-milligram bolus of midazolam, the execution team w[ould] administer an additional 500-milligram dose of midazolam, if needed, until [the prisoner's] sentence [was] carried out." *Id.* at 10.[68]

The ADOC represented that it made this proposal in reliance on Frazier's attorney's Rule 11 affirmation in good faith that he had "a factual basis to believe" that the use of midazolam in a single-drug execution protocol would result in a "constitutionally acceptable" execution. *Id.* at 3. In relying on the attorney's affirmation, was the ADOC implying that an execution protocol consisting of a 500-milligram dose of midazolam with additional doses provided as needed would potentially violate the Eighth Amendment? Put another way, would the ADOC induce the Court to enter a consent decree that might yield a constitutional violation? The answer to each of those questions must be "no." [69]

---

[67] Implicit in this statement is a representation that substituting a single-drug execution protocol consisting only of midazolam for the ADOC's current three-drug protocol would satisfy the requirements of *Baze*, i.e., that the new protocol would "significantly reduce a substantial risk of severe pain." *Baze*, 553 U.S. at 52, 128 S. Ct. at 1532.

[68] Unlike the District Court, the ADOC did not read the Complaint's alternative single-drug proposal as limited to a single 500-milligram dose of midazolam.

[69] On two occasions in other cases challenging the ADOC's current three-drug protocol, the ADOC submitted that single-drug midazolam protocol to the District Court in camera for examination. Indeed, the District Court had previously found that "[t]he parties all agree that (1) midazolam is available, (2) is feasible, (3) it is readily implementable, (4) is not risky with regard to unnecessary pain and suffering."

46

The District Court's error in determining the credibility of Dr. Tackett's testimony and ignoring Dr. Buffington's testimony, which was at odds with Dr. Tackett's, and the significance of the ADOC's offer to substitute a single-drug protocol containing midazolam for its current three-drug protocol require vacation of the summary judgment. Whether that proposal would "significantly reduce a substantial risk of harm," as *Baze* requires, cannot be determined in a vacuum. The Court first must determine what risk of harm, if any, the current three-drug protocol creates.

## IV.

## A.

The ADOC further argues that the District Court's judgment should be affirmed under the law-of-the-case doctrine. That doctrine holds that "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir. 1984) (quoting *Dorsey v. Continental Casualty Co.*, 730 F.2d 675, 678 (11th Cir.1984)). Accordingly, "[a]n appellate decision on an issue must be followed . . . unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a

47

manifest injustice." *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985) (citing *Westbrook v. Zant*, 743 F.2d 764, 768–69 (11th Cir. 1984)).

The ADOC points out (1) that this Court, in *Brooks v. Warden* (*Brooks*), 810 F.3d 812 (11th Cir. 2016), and subsequently in *Grayson v. Warden* (*Smith*), 672 F. App'x 956 (11th Cir. 2016),[70] rejected on the merits Eighth Amendment claims "virtually identical" to Appellants' in that they were "based on the same evidence and allegations" Appellants' claims "present here"[71]; and (2) that the District Court had consolidated *Brooks* and *Smith* with Appellants' cases "to form the 'Midazolam Litigation.'"

Given these circumstances, the ADOC argues (3) that all of the cases are one case, i.e., the same case; (4) that because the appeals in *Brooks* and *Smith* were taken in that one case, the *Brooks* and *Smith* decisions—specifically their holdings—are binding on the proceedings in this appeal; (5) that *Brooks* and/or *Smith* effectively held that the Frazier Complaint failed to allege sufficiently that the current three-drug injection protocol presents a substantial risk of serious harm;

---

[70] The plaintiff, and thus the appellant, in *Grayson* was Ronald Bert Smith. Carey Dale Grayson, to whom the case name refers, was neither a plaintiff in *Smith* nor was involved in Smith's appeal. Grayson's case is pending appeal of a Rule 54(b) judgment disposing of a separate Equal Protection claim he raised. *See supra* note 12.

[71] The ADOC states that "[Appellants] do not present any substantially different evidence from what was presented in *Brooks* and *Grayson*, but rather rely on the evidence this Court rejected in those previous appeals." Appellees' Br. at 19. This is a gross misstatement. The records before this Court in *Brooks* and *Grayson* contained no evidence, and any proffers those records supposedly contained were of no consequence.

48

assuming it presents such harm, that the protocol does not amount to a significant alteration of the previous protocol (using pentobarbital as the first drug) so as to affect a substantial change in the State's method of execution and restart the statute of limitations clock; and (7) that the evidence in the summary judgment record was insufficient as a matter of law to establish that a single-drug protocol consisting of compounded pentobarbital, sodium thiopental, or midazolam was a feasible and readily available alternative execution protocol. Thus, the ADOC argues, Appellants' challenge to the three-drug protocol's Eighth Amendment sufficiency is now precluded.

We are not persuaded that the *Brooks* and/or *Smith* holdings mandate that we affirm the District Court's judgment on the law-of-the-case doctrine. Two independent bases inform our conclusion. First, the cases making up the Midazolam Litigation are not one case; hence, the doctrine is inapplicable. Second, even assuming that they are one case, neither *Brooks* nor *Smith* mandates rejection of Appellants' claims, because those cases did not address the same issue raised in this case.

## 1.

We first consider whether *Brooks* or *Smith*'s holdings control our decision, in whole or in part, in this appeal on the theory that Appellants' cases and Brooks and Smith's cases are one and the same. A review of how *Brooks* and *Smith* were

processed below makes it clear that neither case is one case with Appellants' cases. We begin with *Brooks*.

a.

On September 24, 2015, the State moved the Alabama Supreme Court to set Christopher Eugene Brooks' execution date.[72]  On November 2, Brooks, represented by Appellants' counsel, [73] moved the District Court for leave to "intervene" as a party plaintiff in the litigation of Appellants' cases.  On November 5, 2015, the District Court entered an order consolidating Appellants' cases for "discovery and trial."[74]  Two weeks later, the Court entered a "Final Scheduling Order" in Appellants' cases.  That order set the final hearing date for the cases to April 19–22, 2016, and fixed the fact discovery cut-off date as February 5, 2016.

On November 23, 2015, the Alabama Supreme Court entered an order scheduling Brooks' execution for January 21, 2016.  On the same day, the District Court granted Brooks' motion for leave to intervene.  Brooks filed his complaint the next day.[75]  The complaint essentially mirrored Appellants' complaints.

---

[72] On March 10, 2015, the Alabama Supreme Court, granting the State's motion filed on September 11, 2014, set Brooks' execution date for May 21, 2015.  Prior to that date, the Court granted Brooks' unopposed motion to stay his execution pending the U.S. Supreme Court's decision in *Glossip v. Gross*.

[73] Assistant Federal Defender Palombi, who represented Appellants, filed Brooks' complaint.

[74] The Court did so to "eliminate duplication of discovery, and avoid unnecessary costs."

[75] The complaint was styled "Intervenor Complaint."  The complaint essentially replicated the allegations of Frazier's Complaint and, like that complaint, had as attachments the

50

On December 1, 2015, the ADOC moved the District Court to dismiss Brooks' complaint for failure to state a claim and, alternatively, offered to substitute an increased dosage of midazolam as a single-drug protocol in place of the current protocol for Brooks' execution.[76] Later in the day, the Court ordered the ADOC to file "under seal a proposed alternative one-drug midazolam protocol for lethal injections." On December 3, 2015, Brooks notified the Court that he had moved the Alabama Supreme Court to stay his execution and that the State had opposed his motion.

On December 4, 2015, the ADOC filed its one-drug midazolam protocol under seal, Brooks moved the District Court to stay his execution, and the Court entered an order scheduling an evidentiary hearing on the motion for December 18, which would continue through the week of December 21, 2015 if necessary. The order noticed a prehearing conference scheduled for December 15—at which time the parties would identify their witnesses, scientific reports and other exhibits— and required the parties to submit to the Court on December 18, prior to the

same exhibits, including Exhibits A and B, and the transcript of the evidentiary hearing held in *Arthur* on October 18 and 19, 2012.

[76] The current protocol would be suspended, and, "[a]fter an initial 500-milligram bolus of midazolam, the execution team w[ould] administer an additional 500-milligram dose of midazolam, if needed, until Brooks's sentence [was] carried out." The ADOC made Frazier the same midazolam single-drug protocol offer. *See supra* notes 29–30 and accompanying text.

commencement of the evidentiary hearing, proposed findings of fact and conclusions of law.

On December 8, Brooks filed separately an opposition to the ADOC's motion to dismiss, and a response to the ADOC's submission of the substitute midazolam protocol. The response contended that the substitute protocol was a "legal nullity unless and until the present protocol is found unconstitutional, or Defendants eliminate the present three-drug protocol and adopt a single drug protocol using any of the feasible options that Brooks suggested."

On December 11, 2015, the ADOC responded to Brooks' motion to stay his execution. It contended that the motion should be denied because Brooks had delayed in bringing it and because he was not likely to prevail on the merits of his Eighth Amendment claim. The ADOC conceded that it could not "adequately address the shortcomings in Plaintiff's presentation of evidence [in support of his motion for a stay] because Brooks [was] not required to provide his evidence until December 15, 2015."

On December 14, 2014, Brooks requested the Court to issue subpoenas summoning four witnesses to appear at the evidentiary hearing: Jefferson S. Dunn, Anne Hill, Walter Myers and Kim Tobias Thomas. That same day, the ADOC informed the Court that the Alabama Supreme Court had denied Brooks' application for a stay of his execution. And, also on the same day, the Court

52

entered an order informing the parties that it would resolve Brooks' motion for a stay "in the absence of a hearing," cancelling the prehearing conference scheduled for December 15 and the evidentiary hearing that was to begin on December 18, and declaring "moot" Brooks' request for subpoenas.

On December 22, 2015, the District Court issued a memorandum opinion and order denying Brooks' motion for a stay. The Court explained that it denied the stay because Brooks failed to "demonstrate a substantial likelihood of success on the merits," he "unreasonably delayed filing suit," and the "balance of the equities did not lie in [his] favor for a stay." We affirmed the District Court's denial of his motion for a stay on January 19, 2016. *Brooks v. Warden*, 810 F. 3d 812, 816 (11th Cir. 2016).[77]

*          *          *

It is clear from this series of events that Brooks' case is affiliated with Appellants' cases for only one reason: the Court granted Brooks' motion to "intervene" in Appellants' cases. After the motion was granted, Brooks' case followed one route, while Appellants' cases followed another. Further, the District Court's decision in Appellants' cases was based on an extensive evidentiary record. In contrast, and contrary to the ADOC's representation, the

---

[77] Brooks was executed on January 21, 2016.

Court decided Brooks' motion for a stay "in the absence of a hearing" or a proffer of probative evidence.

In sum, Brooks' case and Appellants' cases were not one case. Whatever our *Brooks* decision may have held, its holdings can dictate no part of the decision we reach in this appeal.

b.

We now turn to *Smith*. On February 2, 2016, the State moved the Alabama Supreme Court to set a date for the execution of Ronald Bert Smith. On April 15, 2016, after discovery had closed in Appellants' cases and just four days before Appellants' cases were set to be tried, Smith filed a complaint against the ADOC.[78] Smith's complaint alleged three causes of action. Only the first cause of action corresponded to the single claim stated in Frazier's Complaint: "Alabama's method of execution violates Plaintiff's right to be free from cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, because midazolam will not sufficiently anesthetize him such that he

---

[78] Note that the defendants are the same as those named in Frazier's Complaint except for Carter Davenport. He replaced Walter Myers as Warden of the Holman facility. We refer to the defendants collectively as "the ADOC."

Assistant Public Defender Spencer Jay Hahn signed Smith's complaint as his attorney. The complaint was one of five Hahn filed between April 15 and 18, 2016, on behalf of prisoners awaiting execution. Those prisoners were Charles Lee Burton, Robert Bryant Melson, Geoffrey Todd West and Twane McNabb. The five cases were effectively processed as one case until the Alabama Supreme Court set the date for Smith's execution. From that point going forward, the District Court handled Smith's case separately. For this reason, in the discussion that follows, we refer only to Smith's case—from the time of its filing on April 15, 2016, to its conclusion with the entry of final judgment on November 18, 2016.

will not feel the painful effects of potassium chloride."[79]  The complaint proposed a single-drug protocol consisting of compounded pentobarbital, sodium thiopental, or midazolam as an alternative method of execution.  The midazolam description differed from the description in Frazier's Complaint in that it added these assertions: "The third viable alternative is a one-drug protocol consisting of a large initial dose of midazolam, followed by a continuous infusion."  The complaint further alleged, "Plaintiff's expert, Dr. Tackett, believes that a 500 mg bolus of midazolam, followed by a continuous infusion, would eventually suppress the inmate's breathing, resulting in death."  Like Frazier's Complaint, Smith's complaint included factual assertions unnecessary to state an Eighth Amendment claim, *see supra* Part II, and added a description of Christopher Eugene Brooks' execution that took place on January 21, 2016, concluding that "Mr. Brooks was not insensate at the time he was injected with rocuronium bromide and potassium chloride."

---

[79] The second cause of action bore the heading: "Defendants do not have an adequate method to ensure that Plaintiff is properly anesthetized prior to injection with rocuronium bromide and potassium chloride, creating a substantial risk of torturous pain."  And the third cause of action was titled: "Defendants' policy of refusing a condemned inmate's legal team witnessing his or her execution access to a cellular phone or land line during the execution constitutes a denial of access to the courts in violation of the First, Eighth, and Fourteenth Amendments to the United States Constitution."  Neither cause of action corresponds to Appellants' Eighth Amendment claims.

55

Attached to Smith's complaint were nine exhibits, A through I.[80]  They were cited in the complaint solely by exhibit letter in footnotes, e.g., "Ex. A."  We assume that the drafter of the complaint intended that the exhibits be incorporated into the complaint in full; otherwise, they were mere extraneous surplusage.[81]

On April 28, 2016, thirteen days after Smith filed his complaint, the District Court entered an order granting the parties'

> joint motion to consolidate [Smith's case] with the Midazolam Litigation provided that a Scheduling Order be entered to accommodate the filing of a Rule 12 motion [to dismiss for failure to state a claim] and if denied, a brief period of time for limited fact discovery, and the filing of a motion for summary judgment.

The order contained the requested scheduling order, which set the time frames for filing a motion to dismiss, for discovery in the event a motion to dismiss was denied, and for summary judgment.[82]

---

[80] Exhibits A through F contained over 100 pages of non-essential information, including a previously filed motion to set an execution date for Gregory Hunt, correspondence between the Ohio Department of Corrections and a division of the FDA, an expert report, and various policy guidelines from Arizona regarding that state's execution methods.  Exhibits A through F relate to the complaint's first cause of action.

[81] The exhibits contained nothing that could be considered a factual allegation relating to the complaint's first cause of action.

[82] These were the time frames: 30 days for filing a motion to dismiss, 21 days for the response, and seven days for a reply.  If the motion to dismiss was denied, parties had 30 days "to conduct fact discovery that [would] be limited to claims and information contained in the five new complaints . . . that differ from those in the complaints filed in [the Midazolam Litigation]".

The time frames for summary judgment motions were as follows: 21 days from the end of the 30-day limited discovery period, 21 days for the response, and seven days for a reply.

On May 31, the ADOC moved the District Court to dismiss Smith's complaint.[83] The motion contained the same alternative disposition the ADOC offered Brooks. It would consent to Smith's execution pursuant to a single-drug protocol consisting of midazolam. The ADOC read Smith's complaint as a "general challenge" to its three-drug protocol that uses a paralytic and potassium chloride as the second and third drugs. Thus, it argued, the challenge should have been brought during the two-year statute of limitations period that began to run on July 31, 2002, "after Alabama changed its method of execution to lethal injection."[84] Smith responded to the motion on June 27, 2016, and the ADOC replied on July 5, 2016.

On September 14, 2016, the Alabama Supreme Court granted the State's motion to set Smith's execution date and scheduled the execution for December 8, 2016. Smith did not respond by moving the Alabama Supreme Court or the District Court to stay the execution. Nothing occurred until November 9, 2016, when the District Court entered an order for the purpose of "explor[ing] the midazolam option pled and urged by Mr. Smith and presently offered by Defendants." The Court explained:

---

[83] The motion was addressed to all five complaints Hahn filed between April 15 and 18, 2016. *See supra* note 34.

[84] The ADOC's motion also contended that Smith's complaint failed to allege adequately that the current three-drug protocol created a substantial risk of severe pain and that the single-drug protocols the complaint proposed were feasible and readily available alternatives.

57

> Because Mr. Smith has pled it and offered the option as viable, readily implemented and available, Defendants have accepted the offer. The parties all agree that (1) midazolam is available, (2) it is feasible, (3) it is readily implementable, and (4) it is not risky with regard to unnecessary pain and suffering. Mr. Smith's complaint proposes a one-drug protocol consisting of a "large initial dose of midazolam, followed by continuous infusion."

The Court therefore ordered the ADOC to submit to the Court for "on or before November 14, 2016, a current one-drug execution protocol and a current three-drug execution protocol for *in camera* inspection."  It also ordered Smith to show cause, by November 16, 2016, "why the court should not order Defendants to execute him using the method pled in his complaint, *viz.*, a large initial dose of midazolam, followed by continuous infusion."  The ADOC's reply to Smith's showing was due on November 18, 2016.

Smith responded to the show-cause order as directed, with this penultimate statement:

> This Court can and should order the Defendants to use Mr. Smith's identified single-drug midazolam alternative. Before it can do so, this Court must enjoin the Defendants from using the present protocol, and this Court must be satisfied that Defendants have adopted an adequate protocol, including accounting for all necessary equipment and sufficient training to execute Mr. Smith using his proposed single-drug midazolam alternative.   Assuming these prerequisites are satisfied, then this Court can order the Defendants to use Mr. Smith's single-drug midazolam alternative identified in his complaint and detailed in Dr. Tackett's report . . . .[85]

---

[85] The report referred to is Exhibit F in Smith's complaint.

58

In his report, Dr. Tackett, referring to the midazolam alternative, recommended "a loading dose between 2.5 and 3.75 grams" of midazolam "followed by a continuous IV infusion until death."

The ADOC, replying on November 18, rejected Smith's proposal that the ADOC employ Dr. Tackett's formulation of the midazolam alternative, contending that his proposed formulation was a material departure from the formulation Smith described in his complaint, "a one-drug protocol consisting of a 500-milligram bolus of midazolam followed by a continuous infusion."

On receiving the ADOC's reply to Smith's response to its order to show cause, the Court took two steps, both on November 18.  First, realizing that Smith and the ADOC had reached an impasse, the Court entered an order abandoning further consideration of the midazolam alternative.[86]  Second, in a Memorandum Opinion and Order, it granted the ADOC's motion to dismiss Smith's complaint. *Grayson v. Dunn*, 221 F. Supp. 3d 1329, 1330 (M.D. Ala. 2016).  The Court read Smith's challenge to the ADOC's execution protocol in light of the arguments the

---

[86] The Court described the parties' respective positions in this way:
[Smith's position was] (1) that the court [could not] enter such an order without first finding the current three-drug protocol unconstitutional, invalidating it, and enjoining its future use; (2) Smith's complaint had an error when referencing 500 mg of midazolam; it should have been 2500 mg; and (3) Smith included additional requirements: "necessary equipment and sufficient training," plus a plan to deal with a supposed "paradoxical reaction" that allegedly occurs in 2 percent of the population. . . . [The ADOC] "strongly resist[s] all such requirements, as well as each of Smith's positions."

ADOC advanced in its motion to dismiss, Smith's response, and the ADOC's reply

to his response.  As a result, the Court agreed with the ADOC that Smith was

mounting a time-barred

> challenge to all three-drug protocols that employ a paralytic as the second drug and potassium chloride as the third drug. In his response, Smith does not address Defendants' contention that his claim, in actuality, is a challenge against the use of any three-drug execution protocol. And this claim accrued long ago.

*Id.* at 1334 (internal citation omitted).  The Court observed that "Smith could have

challenged the ADOC's use of a three-drug protocol any time after it was

implemented fourteen years ago on July 31, 2002, but he failed to do so until

2016."  *Id.* at 1333.  Smith appealed the District Court's decision to this Court on

the same day, November 18.  On December 7, 2016, we affirmed the District

Court's decision.  *Grayson v. Warden*, 672 Fed. App'x 956, 958 (11th Cir. 2016).[87]

In granting the ADOC's motion to dismiss, the District Court made it clear

that its Memorandum Opinion and Order applied only to Smith's case.[88]

\*            \*            \*

Notwithstanding that the District Court's decision only applied to Smith's

case, the ADOC now represents to this Court that Smith's challenge to its

---

[87] Smith was executed on December 8, 2016.

[88] "Defendants' motion concerns Smith and four other plaintiffs (Charles Lee Burton, Robert Bryant Melson, Geoffrey Todd West, and Torrey Twane McNabb), all of whom were consolidated into the Midazolam Litigation on April 28, 2016.  This Memorandum Opinion and Order addresses Defendants' motion only in relation to Smith's complaint." *Grayson v. Dunn*, 221 F. Supp. 3d 1329, 1330 n.2 (M.D. Ala. 2016).

execution protocol was "virtually identical" to Appellants' in that both challenges were "based on the same evidence and allegations." This representation is incorrect. Smith's case was decided on allegations in the pleadings, not on evidence as the ADOC represents. At that stage, discovery was closed in Appellants' cases and Appellants' cases were set to be tried. Smith did not proffer the evidence he would introduce at a trial on the merits. The Court thus based its dispositive ruling on the pleadings alone. In contrast, the District Court in Appellants' cases granted summary judgment based on a full evidentiary record.

Put simply, it cannot reasonably be argued that Smith's case and Appellants' cases were one case such that any issue we decided in disposing of Smith's appeal should have a binding effect on our disposition of this appeal under the law-of-the-case doctrine.

2.

Assuming that we are wrong in concluding that Brooks and Smith's cases are not "the same case" as Appellants' cases, our decisions in those two cases do not preclude Appellants' claims unless those prior decisions decided the same issues Appellants now raise. The law-of-the-case doctrine "bars consideration of only those legal issues that were actually, or by necessary implication, decided in the former proceeding." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (11th Cir. 2005) (quoting *Oladeinde v. City of Birmingham*, 230 F.3d

61

1275, 1288 (11th Cir. 2000)).  We therefore consider sequentially what our decisions in *Brooks* and *Smith* held and whether those holdings should have a bearing on our disposition of this appeal.

a.

The question before this Court in *Brooks* was whether the District Court abused its discretion in denying Brooks' application for a stay of his execution. *Brooks*, 810 F.3d at 816.  "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous."  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (quoting *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002)).  The legal standard governing the District Court's disposition of Brooks' motion for a stay of his execution is settled law:

> A court may grant a stay of execution *only* if the moving party establishes that: "(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; *and* (4) if issued, the injunction would not be adverse to the public interest."

*Brooks*, 810 F.3d at 818 (emphasis added) (quoting *Powell v. Thomas*, 641 F.3d 1255, 1257 (11th Cir. 2011)).

The District Court denied Brooks' application for a stay on two independent grounds.  First, Brooks failed to establish a substantial likelihood of success on the

merits of his Eighth Amendment claim.[89]  Second, he unreasonably delayed filing

suit; moreover, on balance, the equities counseled a denial of a stay.  The second

ground is irrelevant for the ADOC's purposes.  It is our review of the first ground

that resulted in the holdings that purportedly require the affirmance of the District

Court's judgment.

The first ground presents a mixed question of fact and law.[90]  It does so due

to the way in which a district court determines whether a prisoner challenging a

state's method of execution has established a likelihood of success on the merits of

his claim.  The court engages in a three-step process.  In the first step, the court

decides a question of law: whether the plaintiff has stated a claim for relief—here,

whether the prisoner's claim, as alleged, satisfies the *Baze* standard.[91]  On appeal,

we review its decision *de novo*.  If the district court concludes that the prisoner's

claim fails to satisfy that standard, it denies a stay and the three-step process

---

[89] Since the District Court denied a stay because Brooks failed to establish a substantial likelihood of success on the merits, it was unnecessary for the Court to determine whether Brooks satisfied the second, third or fourth factors in the four-part test for granting a stay.  *See, e.g.*, *Valle v. Singer*, 655 F. 3d 1223, 1226 (11th Cir. 2011) (per curiam) (holding, on the sole basis that the prisoner failed to establish a substantial likelihood of success, that District Court did not abuse its discretion in denying him a stay of his execution).

[90] This is so in any case in which a party has moved for a stay.  The same four-part test applies when a party seeks a preliminary injunction.  *See, e.g.*, *Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627 (11th Cir. 1992) (outlining the four-part test for granting a preliminary injunction).  Thus, in both contexts, the substantial-likelihood test is a mixed question of law and fact.

[91] We refer to *Baze*'s two-prong standard.  The claim must allege that the lethal injection protocol creates "a substantial risk of serious harm" and identify an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain."  *Baze*, 553 U.S. at 50, 52, 128 S. Ct. at 1520.

ends.[92]  If the claim satisfies the *Baze* standard, the court takes the second and third steps.  In those steps, the court functions as a fact finder, and we review its findings for clear error.

In the second step, the court considers the evidence the prisoner has proffered in support of his claim and finds whatever facts the evidence establishes.[93]  In the third step, the court weighs the facts found in the second step to determine whether they demonstrate a likelihood that the prisoner's claim will succeed at trial.  The outcome in most cases will depend on whether the court finds the testimony of the prisoner's expert witnesses credible and persuasive.[94]

In *Brooks*, in addition to establishing that the current three-drug protocol created "a substantial risk of serious harm," *Baze*, 553 U.S. at 50, 128 S. Ct. at 1520, the prisoner had to demonstrate that the substitution of midazolam for pentobarbital as the first drug in the protocol constituted a "substantial change" in the State's method of execution; otherwise, his claim was time-barred.  Whether he carried that burden was a factual determination.  We reviewed the District Court's finding that he failed to carry that burden for clear error.

---

[92] On *de novo* review, if we agree with the district court's conclusion, we affirm since the denial of a stay could not have constituted an abuse of discretion.

[93] The facts include, of course, the inferences that can reasonably be drawn from the evidence.

[94] Our focus in this discussion thus far has been on the first factor of the four-factor stay test.  If the prisoner establishes the first factor, he must establish the others as well.  In *Brooks*, the prisoner failed to establish the first factor; hence, whether he could have established the other factors became irrelevant.

We consider first the holdings the *Brooks* Court reached in affirming the

District Court's decision that Brooks failed to establish a substantial likelihood of

success on the merits of his Eighth Amendment claim.  After that, we consider the

holdings the panel reached in affirming the District Court's finding that Brooks

failed to proffer any evidence that would establish a substantial likelihood that the

substitution of midazolam for pentobarbital affected a "substantial change" in the

State's method of execution and thus reset the statute of limitations clock.

i.

The *Brooks* panel assumed that the District Court, in taking the first step in

deciding the likelihood-of-success issue, concluded that Brooks' statement of his

Eighth Amendment claim satisfied the *Baze* standard[95]:

> In his intervenor complaint, Brooks . . . alleged that
> midazolam—the first of the three drugs used in Alabama's execution
> protocol—will not properly anesthetize him so as to prevent him from

---

[95] The panel assumed that Brooks' complaint stated a plausible claim under *Baze* because "[t]he district court did not dismiss [his] complaint for failure to state a claim, and he [was] not appealing any decision to that effect." *Brooks*, 812 F.3d at 819 n.1.  The District Court had previously denied the ADOC's motion to dismiss Appellants' claims pursuant to Fed. R. Civ. P. 12(b)(6), and since Brooks' challenge to the current three-drug protocol was framed in the same language as Appellants' challenge, the District Court, to be consistent, would have denied the ADOC's motion to dismiss his challenge.  We also note that in *Arthur*, the District Court, referring to the plaintiff's similar challenge to the current three-drug protocol, concluded that the plaintiff "sufficiently pleaded an Eighth Amendment claim," but he "failed to prove" that either compounded pentobarbital or sodium thiopental was "readily available to the ADOC." *Arthur*, 2016 WL 1551475, at *9–10 (M.D. Ala. Apr. 15, 2016).  Appellants and Brooks' claims that the three-drug protocol created the "substantial risk of serious harm" *Baze* describes were nearly identical to the plaintiff's claim in *Arthur*.

65

feeling an "unconstitutional level of pain" associated with the injection of the other two drugs that will kill him (rocuronium bromide and potassium chloride). He also claims that midazolam may exhibit a "ceiling effect"—that is, at a certain point, an increase in the dose administered will not have any greater effect on an inmate. Brooks says that there are three alternative methods of execution available to the ADOC that significantly reduce the risk of an unconstitutional level of pain: (1) a single injection of pentobarbital; (2) a single injection of sodium thiopental; or (3) a single injection of midazolam.

*Id.* at 819.[96] Next, the panel looked to the evidence Brooks proffered in support of these allegations. Like the District Court, it found none.

The Court agreed with the District Court that Brooks proffered nothing to suggest he was likely to succeed at trial under the *Baze* standard. As for the risk of pain the current protocol allegedly created, "[o]n this record, [the Court concluded that] Brooks has not established a substantial likelihood that the State's lethal injection protocol creates a 'demonstrated risk of severe pain.'"[97] *Id.* at 818. Among other things, Brooks proffered no evidence indicating a likelihood that a 500-milligram dose of midazolam would not render the prisoner insensate prior to the administration of the second and third drugs, the paralytic and potassium chloride.

---

[96] The Court indulged this assumption because "[t]he district court did not dismiss Brooks' complaint for failure to state a claim." *Brooks*, 810 F.3d at 818. The question before the Court was whether the District Court abused its discretion in denying Brooks a stay of execution. The question was not whether his complaint stated a claim for relief. *Id.* at 822 n.10.

[97] The panel disregarded, without comment, all of the extraneous information relating to midazolam's effectiveness contained in Brooks' complaint, which was identical to Frazier's complaint. *See supra* notes 14–23 and accompanying text.

As for the single-drug protocol of compounded pentobarbital, sodium thiopental, or midazolam Brooks proposed as an alternative method of execution, the panel concluded that Brooks had not shown a substantial likelihood that any of the three drugs, alone, presented a feasible and readily implementable alternative as defined by *Baze*. *Id.* at 819–22.[98]  Moreover, "[o]n this record, Brooks has

---

[98] As indicated below, the panel considered useless the evidence Brooks proffered in an effort to show that a single-drug protocol consisting of any of the three drugs was a feasible and readily implementable alternative to the current three-drug protocol.

> Regarding the compounded pentobarbital option,
> Brooks provides three pieces of evidence in support of his allegation that a single dose of pentobarbital is a known, available, and safer alternative method of execution. [H]e cites news articles showing that in other states (Texas, Colorado, Ohio, Georgia, Missouri, Mississippi, Oklahoma, South Dakota, and Pennsylvania), nearly forty inmates have been executed using 'a single bolus of pentobarbital, making it the most common method of execution in the United States.'

*Brooks*, 810 F.3d at 819.  Regarding the sodium thiopental option,

> Brooks proposes the use of sodium thiopental, and alleges that it is available based on the representations of three states—Nebraska, Ohio, and Texas—that they could legally obtain the drug.  Brooks cites as support just a newspaper article in which the governor of Nebraska announced that the state had purchased sodium thiopental from India.  He also cites a second news article reporting that Texas had received approval from the Drug Enforcement Agency to import sodium thiopental.  And, finally, he references a letter from Ohio to the Food and Drug Administration ("FDA") claiming that there are legal ways to import sodium thiopental for use in executions.

*Id.* at 820.  As for the midazolam option,

> the only evidence that Brooks has provided us regarding the efficacy of a single-drug execution protocol using midazolam is a citation to *Glossip*, where the Court noted that the district court had found that 'a massive 500–milligram dose' of midazolam 'will likely cause death in under an hour.'  *Glossip*, 135 S.Ct. at 2741 n. 4.  Brooks admits in his complaint that a single drug lethal injection protocol using midazolam 'has not previously been used,' and 'there are still questions

67

failed to show a substantial likelihood that a single-drug execution protocol using only midazolam is a feasible, readily implementable, and significantly safer method of execution." *Id.* at 821.

In concluding that the District Court had not abused its discretion in deciding that Brooks had not established a likelihood of success, the Court made it clear that its decision was based solely on the record presented:

> [n]othing we say should be read as holding that single-injection drug protocols could not offer valid alternatives. Rather, on this record, we hold only that Brooks has failed to show that Alabama's three-drug protocol creates "a demonstrated risk of severe pain" and that "that risk is substantial when compared to the known and available alternatives."

*Id.* at 822 (emphasis added).

ii.

Additionally, the District Court found as a fact that Brooks failed to proffer any evidence demonstrating that it was substantially likely that the substitution of midazolam for pentobarbital affected a substantial change in the State's method of execution. The finding served as an alternative ground for concluding that Brooks failed to establish the first factor of the stay test, a substantial likelihood of success on the merits.

---

concerning whether the ceiling effect of midazolam would preclude a fatal dose of the drug.'

*Id.* at 821.

To make the requisite showing, Brooks had to present the District Court with some evidence. Mere allegations were insufficient. But Brooks presented nothing. We therefore affirmed the Court's finding:

> The crux of Brooks's argument is that the three-drug protocol Alabama implemented on September 11, 2014, constitutes a substantial change because midazolam as the first drug—as opposed to pentobarbital or sodium thiopental—is not an effective analgesic (or pain reliever). But *he has provided no evidence* to show that pentobarbital or sodium thiopental would have been any more effective in numbing him against the alleged risk of pain posed by the administration of the second and third drugs, which have remained essentially unchanged since 2002. Because *he has proffered nothing* to establish, by a substantial likelihood, that midazolam constituted a "substantial change" from the earlier protocol[ ], we cannot say that the 2014 switch to midazolam triggered a new statute-of-limitations period.

*Id.* (emphasis added).

This language is not a holding that Brooks' complaint failed to allege that the substitution of midazolam for pentobarbital in the three-drug protocol did not affect a substantial change in the State's method of execution. Rather, it represents an implicit holding that the District Court did clearly err in finding, based on Brooks' nonexistent proffer, that Brooks had not demonstrated a likelihood that the substitution affected a substantial change.

\*          \*          \*

In sum, we concluded that the District Court did not abuse its discretion in finding that Brooks failed to demonstrate a substantial likelihood he would succeed

69

on the merits. Our conclusion was based solely on the insufficiency of Brooks'

proffer. His proffer did not present evidence sufficient to demonstrate he was

likely to meet both prongs of the *Baze* standard, and it failed to present any

evidence whatsoever that the substitution of midazolam for pentobarbital

constituted a substantial change in protocol and thus reset the statute of limitations

clock. For both of those reasons, we held that the District Court did not abuse its

discretion in denying Brooks' motion for a stay. *That* is the law of the case.

The ADOC agrees that no abuse of discretion occurred, but disagrees that

that holding is the only law of the case.[99] It contends that given the virtual identity

of the allegations in Brooks and Appellants' respective complaints, the law of the

case also includes a holding that Appellants' complaints fail to state a claim for

relief for two reasons: First, the substitution of midazolam for pentobarbital as the

initial drug in the three-drug protocol did not create a "substantial change" in the

protocol, one that "significantly alter[ed] the method of execution," *Gissendaner v.*

*Comm'r, Ga. Dept. of Corrections*, 779 F.3d 1275, 1282 (11th Cir. 2015);

therefore, Appellants' claims are time-barred. Second, midazolam's presence as

---

[99] The ADOC does not argue that *Brooks* controls this case as pure precedent. They were wise not to do so, for the *Brooks* panel explicitly stated that it was not so. *See Brooks*, 810 F.3d at 822 ("Nothing we say should be read as holding that single-injection drug protocols could not offer valid alternatives. Rather, on this record, we hold only that Brooks has failed to show that Alabama's three-drug protocol creates 'a demonstrated risk of severe pain' and that 'that risk is substantial when compared to the known and available alternatives.'").

the first drug in the three-drug protocol does not create the "substantial risk of serious harm" *Baze* describes.

But *Brooks* cannot perform that dual service, because our decision did not address either of those issues. The decision—that a District Court did not abuse its discretion in denying an eleventh-hour stay motion accompanied by a proffer devoid of probative evidence—has absolutely no law-of-the-case implications in reviewing a later summary judgment motion decided on the sufficiency of evidence *actually* offered by both parties.[100] Put simply, our holding in *Brooks* was far more limited in reach than the ADOC contends. The ADOC's law-of-the-case argument therefore fails.

b.

We now turn to *Smith*. That decision was not published; therefore, the decision is not precedent. Nonetheless, assuming that Smith and Appellants' cases are one, *Smith*'s holdings are binding to the extent they adjudicated issues involved in this appeal. But we did not adjudicate any such issues in *Smith*. To begin, the District Court made it unambiguously clear that it decided Smith's case only. Although the ADOC's motion to dismiss addressed Smith's case and the cases of

---

[100] Indeed, nothing in *Brooks* precludes, on law-of-the-case grounds or as precedent, a contrary resolution of the *same issues* on the basis of a *different evidentiary record*. A District Court could abuse its discretion by denying a stay if another party were to bring a stay motion with a proffer that tends to persuasively show that the switch to midazolam constituted a substantial change in protocol and that a proposed one-drug protocol is an adequate substitute.

71

four other plaintiffs who filed suit at the same time, the District Court expressly stated that its decision applied only to Smith's case.[101] It stands to reason that if the District Court's decision did not apply to the four other plaintiffs, whose complaints were identical, we could hardly say that even though our affirmance of the Court's decision was not binding in those plaintiffs' cases, it is somehow binding in Appellants' cases.

Moreover, *Smith* reviewed a complaint unlike the complaints in Appellants' cases. The ADOC read Smith's complaint as "a general challenge to three-drug protocols, which could have been raised at any time after Alabama began using a three-drug protocol in its executions in 2002 and was thus barred by the applicable two-year statute of limitations." *Grayson v. Warden* (*Smith*), 672 F. App'x 956, 961 (11th Cir. 2016). We observed that Smith did not address the ADOC's interpretation "that his claim, in actuality, is a challenge against the use of any three drug execution protocol," *Grayson v. Dunn*, 221 F. Supp. 3d 1329, 1334 (M.D. Ala. 2016), so the District Court effectively adopted it.[102]

---

[101] "Defendants' motion concerns Smith and four other plaintiffs (Charles Lee Burton, Robert Bryant Melson, Geoffrey Todd West, and Torrey Twane McNabb), all of whom were consolidated into the Midazolam Litigation on April 28, 2016. This Memorandum Opinion and Order addresses Defendants' motion only in relation to Smith's complaint." *Grayson v. Dunn*, 221 F. Supp. 3d 1329, 1330 n.2 (M.D. Ala. 2015).

[102] The District Court also adopted the ADOC's reading because, in the Court's mind, this was what the drafter of Smith's complaint intended. It reasoned:

> If Smith's challenge were simply to the substitution of midazolam in the three-drug protocol, then to comply with *Glossip*, he would be required to propose an alternative drug(s), such as sodium thiopental or pentobarbital,

72

We thus affirmed the Court's decision:

[W]e agree with the district court that Smith's allegations pose a general challenge to the use of a three-drug protocol—and the pain caused by the paralytic and the potassium chloride used as the last two drugs in the protocol—rather than to the use of midazolam per se. The gist of Smith's claim is that the State's "continued use of a three-drug protocol . . . is unjustified in light of the fact that there are ready and available alternatives which would significantly reduce the substantial risk of severe pain." In support of the claim, Smith cites (1) the fact that fourteen states have adopted or announced plans to adopt a single-drug protocol and (2) studies recommending that states discontinue three-drug protocols and instead use a single large dosage of a barbiturate because execution team members "typically are not medically trained personnel and administering three drugs creates greater opportunity for error" that would be ameliorated by a one-drug method. Alabama's switch to midazolam has no bearing on these allegations, which Smith could have asserted any time after Alabama instituted lethal injection per a three-drug protocol in July 2002.

*Smith*, 672 F. App'x at 963.  In contrast, Appellants have made no such "general challenge to three-drug protocols" in this case.

*          *          *

In fine, even assuming that Smith's case and Appellants' are one, such that a *Smith* holding on an issue would bind our decision on the same issue under the

---

to be used as the first drug in the ADOC's three-drug protocol, essentially a return to the ADOC's pre-midazolam protocol. Instead, Smith proposes the use of either pentobarbital, sodium thiopental, or a 500–milligram dose of midazolam, *administered in a one-drug protocol*, rather than in a three-drug protocol. These one-drug protocol proposals strip away the veneer from Smith's claim, revealing its true identity: a challenge to all three-drug protocols that employ a paralytic as the second drug and potassium chloride as the third drug.

*Grayson v. Dunn*, 221 F. Supp. 3d 1329, 1334 (M.D. Ala. 2016).

law-of-the-case doctrine,  the claim Smith advanced—as determined by the District Court in his case—is not the claim Appellants present.  The allegations in their complaints challenge the current three-drug protocol as creating a substantial risk of serious harm and propose a feasible and readily available alternative, a single-drug protocol consisting of compounded pentobarbital, sodium thiopental or midazolam.

Like the ADOC's law-of-the-case argument based on *Brooks*, its argument based on *Smith* fails as well.

V.

For the foregoing reasons, we vacate the District Court's judgment in all of Appellants' cases and remand the cases for further proceedings.

On remand, the District Court must address Appellants' Eighth Amendment claims in the proper order.  The second prong of the *Baze* standard requires a claimant to show that the protocol he proposes would "significantly reduce a substantial risk of serious harm" in comparison with the current protocol.  *Baze*, 553 U.S. at 52, 128 S. Ct. at 1532.  Thus, the District Court cannot properly apply the *Baze* standard without first making a finding regarding the risk of pain, if any, the current three-drug protocol presents.  One cannot evaluate whether an alternative proposal does or does not "significantly reduce" a given risk without first knowing what that risk is.  *See Brooks*, 810 F.3d at 819 ("[C]apital prisoners

74

seeking a stay of execution must show 'a likelihood that they can establish *both* that [the state's] lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives.'") (emphasis added) (quoting *Baze*, 553 U.S. at 61, 128 S.Ct. at 1520). As we see it, the claim here is that midazolam creates a substantial risk of severe pain when compared to the alternatives Appellants submitted. Accordingly, the District Court must first determine what risk the current three-drug protocol—with midazolam as the first drug—presents before considering the adequacy of Appellants' proposed alternatives, especially since it has by now been clearly established that midazolam is available to the State.

Further, it should be evident from our analysis that the issues the parties' arguments raised—in the District Court and here on appeal—made our task unnecessarily difficult. It was made difficult by the way in which the parties drafted their pleadings, motions, and responses. To begin, the complaints are replete with extraneous information: newspaper articles, websites, committee reports, letters to federal agencies, and hundreds of pages of evidentiary hearings and testimony from another case. *See supra* notes 14–23 and accompanying text. None of that information had any bearing whatsoever on whether the complaints stated a claim for relief under Rule 8(a) sufficient to withstand a Rule 12(b)(6) motion to dismiss. Pleading such extraneous matters affronts the spirit, if not the

75

letter, of Rule 8, which requires pleadings to be "simple, concise and direct."  Fed.

R. Civ. P. 8(d)(1).  Further, the tactic is an end run around Rule 36, which

constrains the drafter to seek admission of only that information which falls within

the scope of discovery pursuant to Rule 26(b)(1), requires each proposed

admission to be separately stated, and provides the opposing party a proper

opportunity to admit or deny the information.[103]  It appears that the pleader's goal

---

[103] Rule 36 states, in relevant part:
(a) SCOPE AND PROCEDURE.

(1) *Scope.* A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:

(A) facts, the application of law to fact, or opinions about either; and

(B) the genuineness of any described documents.

(2) *Form; Copy of a Document.* Each matter must be separately stated. A request to admit the genuineness of a document must be accompanied by a copy of the document unless it is, or has been, otherwise furnished or made available for inspection and copying.

(3) *Time to Respond; Effect of Not Responding.* A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

(4) *Answer.* If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest. The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny. . . .

 (b) EFFECT OF AN ADMISSION; WITHDRAWING OR AMENDING IT. A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the

in engaging in this tactic is to shoehorn information into the evidentiary foundation of the trial by pressing the defendant to admit or deny them in his answer. That the ADOC did not move the Court to strike the information, or that the Court failed to do so, does not make it any less offensive to the Federal Rules.

In the same vein, the ADOC's answer was hardly paradigmatic of Rule 8's spirit or letter. Its answer contained eighteen affirmative defenses,[104] the majority of which consisted of one line of text, and therefore left opposing counsel and the District Court at a loss to understand the bases upon which most of those defenses were asserted. For example, why do Appellants lack standing to challenge the constitutionality of the State's current execution protocol on the ground that its first drug will fail to render them insensate during their executions? Why do Appellants have unclean hands? If the claim is barred by "res judicata," which doctrine applies—claim or issue preclusion? And the judgment of what prior lawsuit gives rise to the res judicata bar?

If, in the proceedings that follow, Appellants are able to make out a prima facie case of an Eighth Amendment violation, i.e., that midazolam will not render

---

court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.

Fed. R. Civ. P. 36.

[104] *See supra* note 31 and accompanying text.

the prisoner insensate such that he will suffer serious harm from the administration of the paralytic and potassium chloride, the District Court will have to determine whether any of the ADOC's "avoidance" defenses preclude the relief Appellants seek.[105]  To do that, the Court will have to comprehend the bases of such defenses. It will be unable to do so unless the ADOC provides those bases.

Thus, in our view, in order to move forward with pleadings that comport with the spirit and letter of Rule 8, the District Court should summon the parties to a pre-trial conference for the purpose of shaping the issues for trial.  There, the Court can strike from Appellants' complaints the extraneous information we have cited and require the ADOC to explain the bases of each of its avoidance defenses. The Court's first order of business, though, should be to address the ADOC's sovereign immunity defense.  In asserting this defense as an absolute bar to Appellants' claim, the ADOC "certified" among other things that the defense was "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P.

---

[105] Those "avoidance defenses" correspond to the following letters in the ADOC's answer: A (statute of limitations), B (mootness), C (action barred by the ban on successive habeas petitions), F (res judicata), G (waiver and estoppel), I (unclean hands), K (laches), and N ("Any interest Frazier has in pursuing his claim is outweighed by the State's interest in finality of duly-adjudicated criminal judgments, the timely administration of death sentences, guarding against a flood of similar claims, and ensuring closure for victims, their families, and the public") in the ADOC's response. *See supra* note 31.

11(b)(2).  The Court should therefore require the ADOC to explain the basis of the defense or withdraw it.

Whether the ADOC's use of midazolam as the first drug in its execution protocol will render the prisoner insensate prior to the administration of the second and third drugs will require the presentation of expert opinion testimony.  We assume that Appellants' counsel is prepared to present such testimony, and that the ADOC is prepared to rebut it with expert opinion testimony of its own.  At the pre-trial conference, the Court should require the parties to proffer this expert testimony.  Any dispute as to the qualifications of a witness or the reliability of a witness's opinion should be resolved by the Court in performing its gatekeeping function under *Daubert*.

VACATED AND REMANDED WITH INSTRUCTION.